THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LARRY PAUL MOORE, Defendant-Appellant.

Fifth District    No. 77-400

Opinion filed June 7, 1979.

512

Michael J. Rosborough and Jeff M. Plesko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (Raymond F. Buckley, Jr., and William Zale, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE KARNS delivered the opinion of the court:

Following a jury trial in the Circuit Court of Madison County, defendant, Larry Paul Moore, was convicted of rape, armed robbery and theft of over $150. He was sentenced to concurrent prison terms of 40 to 80 years for rape, 40 to 80 years for armed robbery and 3 to 9 years for theft over $150. From his conviction and sentence, defendant appeals.

On March 16, 1977, a man wearing a ski mask robbed a Wood River family at gun point and raped the family's 16-year-old daughter. The evidence established that the daughter was returning home from the family's business with receipts in a paper bag when she was stopped in her driveway by a masked assailant with a gun, who took the money and led her to the house. The father and mother were in the living room watching television and observed the daughter enter the house accompanied by the masked gunman. The gunman instructed the members to get onto the floor and proceeded to tie the parents' hands. He informed the family that other people were coming with a truck to take the furniture. Because these people would not be masked, the intruder put pillowcases over their heads. About this time, the second daughter arrived home only to be confronted by the gunman, who put a pillowcase over her head, took her watch, and tied her up.

The man removed the pillowcase from the first daughter's head and asked her to help him collect the family's valuables. After he had taken a watch from a dresser, he instructed her to replace the pillowcase and led her to the master bedroom where he told her to lie down. When he then removed his ski mask and went into the hallway, the daughter said that she could see his face through the pillowcase because of the bright hall lighting. He then replaced his mask and entered the room. On the man's persistent and threatening request, the daughter removed her clothing and was told to lie face down on the bed. He asked her to have intercourse with him, but she refused. He then went in and out of the room several times. On one of these occasions, she said she could see him from underneath the pillowcase, which was "pulled up rather high," standing in the doorway without his mask. She saw him for a few seconds under bright hallway lighting before he returned to the dark bedroom. She identified defendant as the person she saw that evening. After the daughter repeatedly refused his persistent requests to have intercourse, he

punched her in the stomach and she screamed. The father, hearing her scream, yelled, "Sir, you said you wouldn't hurt her." The father got up off the floor, pulled the pillowcase over his head and saw the intruder coming down the hallway without his mask. When the intruder was only 10 feet away, the father replaced the pillowcase on his head. He likewise identified defendant as the person he had seen. The father could not explain or demonstrate how he had removed and replaced the pillowcase with his hands tied.

The man returned to the bedroom and once again demanded to have sexual intercourse. After she was threatened and punched numerous times she submitted to his request. The daughter then got dressed and returned to the living room. The intruder gathered the valuables he had taken and fled from the scene in the family's automobile.

The daughter was taken to the hospital where the examining physician discovered two lacerations of the hymen which was still bleeding. Furthermore, it was determined that the stains on the bedding contained semen and the same blood type as defendant's.

Cindy Pasley, a friend of defendant's, testified that prior to the date of the incident, defendant had told her that he was going to rob the family in question and that he had been to the house to look it over. She also stated that defendant came to her apartment after the robbery, explained the occurrence of events, and showed her some of the jewelry. A few days later, Hughey McCloud, defendant's half-brother, asked her for the jewelry, but she denied having it. He then searched the house and found the items in the basement. Approximately a week later, McCloud gave the police some jewelry in his possession. Among the items given to the police were the second daughter's class ring and two of her watches.

Ms. Pasley further testified that when defendant came to her apartment following the robbery he was wearing blue jeans and a "blue jean jacket with something on the back." Defendant later telephoned her and told her to testify falsely about the clothing he had worn on the night in question.

The day following defendant's arrest, the Wood River police were given permission by Irene Lawrence, defendant's grandmother with whom defendant lived, to search her home. They seized a pair of suede ankle high shoes, a blue insulated jacket and a green ski mask among other items from defendant's room. Two days after the robbery, the family was shown the jacket and shoes taken from the grandmother's home. Although no positive identifications were made, the mother and the first daughter identified the lightweight, insulated jacket as being similar in appearance to one worn by the intruder while the father and the same daughter found the shoes to be likewise similar. At trial, the first daughter was able to make a positive identification of the shoes. The

mother was unable to make such an identification, but stated that the intruder was wearing suede, ankle high shoes.

Defendant testified on his own behalf. He denied participating in the offenses committed against the family and denied conversing with Ms. Pasley and showing her any jewelry. He asserted that the shoes and jacket belonged to his half-brother, with whom he shared the room.

Defendant first argues that the trial court erred in allowing the in-court identifications of defendant because they were based upon suggestive pretrial viewings of defendant in a photograph array and lineup, and had no independent basis. The facts established that immediately after the crime, the victims were shown a photo array composed of mug photos. Defendant's picture was not included in this array and the victims were unable to make any positive identifications. From information supplied by the family, Sergeant Eldon McEuen of the Wood River Police Department formed a suspicion of a possible suspect and put together a new photo array which included the defendant. In the meantime, the father aided a police officer in constructing a composite drawing of the intruder. McEuen then telephoned the father and the first daughter and asked them to come to the police station to view the array which he said included a picture of the suspect. Neither the daughter or the father could remember McEuen telling them that a picture of the suspect was part of the display.

The first daughter arrived and viewed the eight pictures, without her father being present. She initially chose two pictures, one of them of defendant, as depicting similar characteristics of the intruder and then settled on the photograph of defendant as the subject. After she made a specific reference to the intruder's eyes and ski mask, McEuen made a cardboard cutout and covered all but the eyebrows, eyes and nose of the chosen photograph. He stated that the daughter then reaffirmed her identification. Although McEuen contended that the daughter viewed the photo array prior to the composite drawing, the daughter testified at the suppressing hearing that she first saw the drawing. Later at trial, she testified that she could not remember whether she had seen the composite drawing before or after the photographs. In any event, the daughter was able to tell the police officer how the composite drawing could be improved so that it would better resemble the assailant. The daughter also testified that the cardboard cutout was placed over the drawing and not over the photograph of the intruder.

The father also viewed the array and chose the same photograph as selected by his daughter. Ten days later, the father and daughter viewed a lineup which included defendant. They both positively and conclusively identified defendant as the assailant.

■■ ■ The law is clear "that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons v. United States*, 390 U.S. 377, 384 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971 (1968).) Applying this standard to the present case, we find that the photographic and lineup identification procedures were not unduly suggestive. Furthermore, it is clear that the identifications of defendant by two of the victims were based upon their observation of him at the scene of the crime.

■■ ■ Defendant, however, contends that the identification by photograph was "tainted" when Sergeant McEuen informed the father and daughter that a suspect was to be included in the display; when McEuen placed a cardboard cutout over the face of defendant's photograph; and when the daughter observed the composite drawing prior to the photo display. The fact that the victims were told that the police had a suspect could not be unduly "suggestive" as the officer was merely stating the obvious. (*People v. Madden*, 52 Ill. App. 3d 951, 368 N.E.2d 384 (1st Dist. 1977).) The victims were well aware that the police would not go to the trouble of arranging a photograph display unless they had a suspect in mind. (*People v. Martin*, 24 Ill. App. 3d 710, 321 N.E.2d 368 (1st Dist. 1974).) We likewise find no impropriety when Sergeant McEuen utilized a cardboard cutout simulating a ski mask. The testimony is clear that the daughter identified the photograph of defendant prior to the utilization of this cutout and only reaffirmed her selection after it was placed over the face of defendant. In any event, the testimony never established that the officer covered defendant's photograph as it was the daughter's impression that the cutout was used on the composite drawing prepared by her father.

■■ We also find no indication that the presence of the composite drawing at the scene of the photo array contributed to any possible suggestive identification. Although it was never firmly established whether the daughter viewed the composite prior to the photographs, it is clear that even if we assume that she did view the images in this order there was no demonstration of suggestive behavior on the part of Sergeant McEuen. In fact, the daughter's ability to explain what was wrong with the composite drawing and to explain how it differed from the intruder indicated that she had a sufficiently good view of him during the commission of the offense and was not influenced by seeing the drawing.

Defendant also contends that the identification was suspect because the victims did not have ample opportunity to view the masked gunman.

A careful reading of the testimony of the victims demonstrates that defendant's contention is in error. Both the father and daughter testified that they observed the intruder without his mask under bright lighting. While it is not clear how the father was able to lift the pillowcase above his eyes, his ability to construct a fairly close resemblance of defendant, prior to the photograph display and the lineup, suggests that his identification was based upon his observation of defendant on the evening of the incident. In addition, the independent selection of defendant by both the father and daughter lends credence to their respective stories that they had ample opportunity to observe the intruder.

■■ Defendant attempts to discredit the identification by pointing out various discrepancies between the victims' description of the intruder to the police and the actual physical characteristics of defendant. For example, defendant claims that the father did not recall defendant's mustache or receding hairline and that the daughter erroneously believed defendant was clean-shaven. It has long been held that minor discrepancies in the description of the assailant, such as the presence or absence of a mustache, will not defeat a positive identification by an identifying witness so long as that person had adequate and ample opportunity to make a first-hand observation. (See *People v. Hefner*, 70 Ill. App. 3d 693, 388 N.E.2d 1059 (5th Dist. 1979); *People v. Ervine*, 64 Ill. App. 2d 82, 212 N.E.2d 346 (1st Dist. 1965).) In the present case, it is clear that both the father and daughter had such an opportunity.

■■ Defendant also argues that the lineup was "tainted" by the prior suggestive photograph array and was, in itself, suggestive. We first note that our prior discussion dispels any notion that the photograph display was improper. In addition, a careful review of the record, including the relevant exhibits, demonstrates that the lineup was not unnecessarily suggestive as to give rise to a substantial likelihood of irreparable misidentification. While it is true that defendant had considerably shorter hair than the other members of the lineup, he had similar hair color and was of comparable height and build. Furthermore, the likelihood of misidentification was at most minimal where the victims had ample opportunity to view the intruder at the time of the crime and were absolutely positive in their identification.

■■■ Defendant next argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt. We disagree. As previously stated, the father and daughter were able to make a positive and credible identification of defendant as the offender. While this fact standing alone is sufficient to support a conviction (*People v. Harrison*, 57 Ill. App. 3d 9, 372 N.E.2d 915 (1st Dist 1978)), we also note that there was additional

evidence tending to implicate the accused. Defendant not only admitted to Ms. Pasley that he was going to rob the family but later confessed to committing the crime. The subsequent discovery of the stolen jewelry linked to defendant along with the seizure of the distinctive shoes and jacket, which many of the victims testified was similar if not actually the same items worn by the intruder, also corroborated the identification of defendant. Moreover, the medical testimony that the daughter had two lacerations of the hymen which was still bleeding corroborated the daughter's testimony that she was raped. While defendant has challenged the testimony of the identification witnesses as being conflicting and incredible and has raised various questions concerning minor inconsistencies of the testimony of all the family members, we note that it was within the province of the jury to assess the credibility of the witnesses and to weigh their testimony. Considering the overwhelming evidence presented against defendant, we cannot say that it was insufficient to find defendant guilty beyond a reasonable doubt.

Defendant also contends that a display of two weapons before the jury was prejudicial where the State failed to demonstrate any connection between the weapons, defendant and the alleged crimes. The evidence established that Officer Crotte of the East Alton Police Department obtained a .38-caliber revolver and a .22-caliber semiautomatic pistol from defendant's brother on March 18, 1977. These guns, which were not admitted into evidence, were shown to the father and first daughter in front of the jury. They both testified that the .38-caliber revolver was similar in barrel length, color and general appearance to the gun used by the intruder. The father also stated that though he was not very familiar with handguns he believed the intruder's weapon was either a .22- or .38-caliber gun.

■■ ■ A handgun is admissible into evidence if there is testimony to connect it with defendant and the commission of the crime. (*People v. Jones*, 22 Ill. 2d 592, 177 N.E.2d 112 (1961).) It was therefore not error to display the .38-caliber revolver obtained from defendant's brother where it was identified as being similar to the intruder's gun (see *People v. Morrow*, 40 Ill. App. 3d 1020, 353 N.E.2d 354 (1st Dist. 1976)) and where, in addition, it was not even admitted into evidence. Although the display of the other gun may have been improper, any error associated with this weapon was not so prejudicial as to require reversal in light of the overwhelming evidence connecting defendant to the various offenses. *People v. Morrow.*

Defendant next contends that the trial court erred in denying his motion for a mistrial after defendant's grandmother allegedly expressed her belief in his guilt. The record indicates that the grandmother had consented to a police search of defendant's room where the officers then

seized various items. During a lengthy cross-examination of the grand-mother, defense counsel attempted to determine whether defendant had given her permission to go through his belongings and whether she was upset with him for living in the home. In response to one of these questions, the grandmother stated that she was not upset "until he did this." Outside the presence of the jury, defense counsel moved for a mistrial but did not request that the comment be stricken.

■■ The decision to grant a mistrial is a matter within the sound discretion of the trial court. (*People v. Bradley*, 43 Ill. App. 3d 463, 357 N.E.2d 696 (4th Dist. 1976).) We find no abuse of discretion in the denial of defendant's motion for a mistrial where the unresponsive remarks were elicited by the defense rather than through the deliberate efforts of the prosecution. While the evidence was improper, the trial court was not required to strike the statement and admonish the jury to disregard it as defendant failed to request such a ruling.

■■ Defendant also argues that the trial court erred in denying his motion to suppress a blood sample taken from defendant and the results of the test. At a hearing prior to trial, the State moved for authorization to take a blood sample from defendant for comparison with the semen stains on the bed where the daughter had been raped. The court granted the motion and ordered defendant to submit to the test at a time and place agreeable to counsel. The subsequent written order, however, stated that the sample be taken "at any reasonable time and place by a licensed physician." Pursuant to this order defendant was taken to a hospital at a reasonable hour for the test. Defendant contends that defense counsel was not notified of the test in accordance with Supreme Court Rule 413(b) (Ill. Rev. Stat. 1977, ch. 110A, par. 413(b)), which provides that the State give reasonable notice of the time and place of the test to the accused and his counsel, who has the right to be present. While the express language of this rule was not complied with, we do not believe defendant was prejudiced by the failure to give proper notice. Defense counsel knew in any event that the samples were going to be taken and was not denied the opportunity to get the results prior to trial. In addition, the test results were hardly damaging to defendant as he had the same blood type as roughly 40% of the population. Accordingly, any error in the admission of this evidence was harmless.

Defendant last argues that the trial court abused its discretion in sentencing defendant to 40-year minimum sentences for the armed robbery and rape convictions. We find no such abuse of discretion where defendant committed such violent and deplorable criminal acts and where his record included prior felony convictions for armed robbery and aggravated battery.

520

For the reasons stated, the judgment of conviction of the circuit court of Madison County is affirmed.

Affirmed.

KUNCE and KASSERMAN, JJ., concur.