THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DANIEL DUARTE, Defendant-Appellant.

First District (2nd Division)   Nos. 77-1481, 78-523 cons.

Opinion filed December 11, 1979.—Rehearing denied January 11, 1980.

John E. Howlett, Jr., of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James Veldman, and Bruce Brandwein, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:
Following a joint bench trial with co-defendant Jack Cozzi (Cozzi), defendant Daniel Duarte (Duarte) was found guilty of the murder of

Patrick Garrison and sentenced to 14 to 20 years in the penitentiary. Defendant Duarte appeals contending (1) that the trial court committed reversible error (a) in denying his motion to suppress the in-court identification testimony of the State's sole occurrence witness, and (b) in excluding testimony of a statement made by co-defendant Cozzi on the basis of the attorney-client privilege, and (2) that the State failed to prove him guilty beyond a reasonable doubt. The following testimony was adduced at trial.

Detective James Caliendo testified that on February 23, 1976, at 11:25 p.m., he arrived at the well-lit scene of the occurrence in front of Bambi's Lounge at 2809 74th Avenue, Elmwood Park, Illinois. In the middle of the street he found a 1969 Oldsmobile Cutlass with its windshield and windows on both sides smashed in. Patrick Garrison was found lying across the front seat. The parties stipulated that Garrison's skull had been fractured by either one substantial blow or a number of blows, with the probability of a single blow greater than the probability of a number of blows. Caliendo recovered a blond bat from a gangway adjacent to Bambi's and a dark bat from the back seat of the car.

Patrick Elliot testified that on February 23, 1976, he lived directly across the street from Bambi's Lounge in the first floor apartment at 7404 West Diversey, Elmwood Park, Illinois. At 11:07 p.m., Elliot was in his darkened bedroom when he heard tires squealing and someone say, "You mother fucker son of a bitch." He then went to the bedroom window which was open about four inches. Since the window shade was pulled down to the sill, he knelt down and looked through the four-inch opening and saw a 1969 Oldsmobile in the middle of the street about 55 feet away with its headlights off. Elliot then saw three people carrying bats walking fast on the east side of the street toward the car. The first man whom he later identified as co-defendant Cozzi hit the hood, the left side of the windshield, and the driver's side window with a light-colored bat and then thrust it through the window. Elliot then saw a second dark-haired person wearing a dark coat and black levis put his right hand on the hood of the car and catapult his body over the front on the passenger side. Elliot further testified that this second person, whom he later identified as defendant Duarte, struck the passenger side windshield with a dark-colored bat several times, crawled into the passenger's side of the car, stayed 10 to 15 seconds, and then crawled out. Elliot could not see inside the car as the inside light of the car was not on. The third person, described only as wearing an orange or tan sports coat, walked toward the back of the car and away. In a statement later given to the police, Elliot stated that when a fourth man came out of the bar and talked to co-defendant Cozzi, everything stopped. After calling to his wife, Elliot returned to the window and saw a dark-colored car pull away from the

*east side of* the street and turn onto Diversey. He also saw a white Buick with a white interior pull out of the gas station and head east on Diversey passing the police as they arrived.

Elliot further testified that he saw the offenders for approximately one to two minutes, that he attempted to call the police while he was watching them, that the offenders were in motion throughout the time, and that his view was unobstructed. Although Elliot testified that there was no lighting from the gas station next door to Bambi's, and that he could not recall whether the gaslights on Bambi's were lit, he also testified that the Miller High Life sign hanging on the lounge was a strong light source and that there were two streetlights, one on the southwest corner of 74th Street and another on the southeast corner of 74th Street and Diversey which hung over Diversey. The parties stipulated that the moon was not visible at the time in question. At the police station that night, Elliot described the first person (co-defendant Cozzi) as being 5'11", weighing 165 pounds, with light hair and a mustache. He described the second person (defendant Duarte) as 5'10", weighing 150 pounds with dark hair. In a statement given sometime later, Elliot described the first person as 6'1", but didn't describe the second person. In the courtroom Elliot estimated defendant Duarte's height as 5'6" or 5'7". The defendant testified that he was 5'4".

Detective Caliendo further testified that co-defendant Cozzi was taken to the police station at about 6:30 a.m. on February 24, 1976, where he was identified in a lineup by Patrick Elliot as the first person. Elliot corroborated Caliendo's testimony as to his identification of Cozzi. Caliendo further testified that at 9 p.m. that night Cozzi told him that he and Duarte had seen an altercation in front of Bambi's with one of their friends, that they had picked up the light-colored bat, and that he was not going to take a murder rap alone. The trial judge stated that he would not consider this statement as evidence against defendant Duarte. On February 25, 1976, at 5:40 p.m., detective Caliendo then went to defendant Duarte's home where he saw him drive up in a white 1975 Buick with a burgundy half-roof and a white interior. Duarte was then arrested, taken to the station, issued an I.R. #, and photographed in the investigation office at about 6 p.m. Detective Caliendo then contacted Patrick Elliot who arrived at approximately 7 p.m. according to Elliot's testimony, when Duarte was in the detention lockup located approximately 15 feet from the main interrogation room. Caliendo did not see Elliot when he entered the police station. Caliendo met Elliot in his office and gave him a mug-shot book containing 30 pages with four pictures per page with the exception of the last. On the last page there were three pictures: defendant Duarte's, bearing the date of February 25, 1976, Cozzi's, and a third unknown picture. According to Caliendo, Elliot

selected the defendants' pictures, and then walked to the back of the main interrogation room where he saw Duarte being processed.

Elliot corroborated Caliendo's testimony as to his identification of defendant Duarte from the mug shots. He further testified that he did not notice the date on the defendant's picture, and that he had seen the defendant in the station after he had viewed the mug book. When requestioned on cross-examination as to whether he had seen the defendant before or after viewing the mug book, Elliot responded, "I saw him before I looked at the mug book, before I saw him on February 23."

Six other persons were arrested the night of February 23, 1976: Andrew Dobis, Thomas Capotosto, Dominick Marzovilla, Ronald Deland, Carmen Rossi, and George Buttacavoli. Dobis, Capotosto, Marzovilla, and Deland testified for the State at the defendant's trial.

Andrew Dobis, the bartender at Bambi's Lounge, first testified that he saw defendant Duarte and co-defendant Cozzi in the bar near the foozball machine at about 11 p.m. with Ronald Deland, Ron's girl friend, and another couple. However, on cross-examination, Dobis testified that the defendants had come into the bar at about 10 p.m., had left 10 minutes later, and were not to be seen again. Dobis further testified on cross-examination that Deland had come into the bar with three other people at 9:45 p.m. and had left just before 11. Although Dobis testified that one of Deland's friends had bought some candy from a girl at about 10:30 p.m., he did not recall being questioned by Deland about some missing money after the purchase. Between 10:30 and 10:45 a Mr. Steer and a friend, and Marge and Ray (Muraski) came into the bar. At about 11 p.m., after Deland had left and just before the police arrived, Dominick Marzovilla came into the bar with George (Buttacavoli), Tom (Capotosto), and Carmen [Rossi]. Dobis further testified that although a neon pizza sign in the window of the bar facing the street was lit, the illumination from it was not very good and he couldn't see anything out of the window. Dobis didn't hear any commotion outside all evening and was first aware of the occurrence when he saw the police placing Garrison's body in the ambulance.

Thomas Capotosto testified that he and his cousin Carmen Rossi drove up behind the victim's car in the middle of the street. Its engine was running and its headlights were on. Capotosto saw the victim lying in the car and a dark-blue baseball bat in the back seat. Carmen then ran into the bar. Although Capotosto knew both of the defendants, he didn't see them at all that night.

Dominick Marzovilla testified that he had left Bambi's at about 10 p.m. and had returned at 10:30 or 10:45 p.m. At 11 p.m. he saw Deland with a girl and another guy, and some men sitting at the bar. Although he knew the defendants, he didn't see them in the bar that

night. Marzovilla further testified that he didn't notice anything unusual either inside or outside the bar until he went outside at about 11 p.m. and saw Deland and a couple of other people around the car. Marzovilla stated that he then picked up one of the bats. Marzovilla was arrested, gave the police a statement at about 1:30 a.m., and later took them to co-defendant Cozzi's home. He was later placed in two lineups in the early morning hours of February 24. According to Marzovilla, neither the signs nor the coach light on Bambi's were very bright. He could not recall whether the coach light was on.

Ronald Deland had known both of the defendants for several years. He arrived at Bambi's at about 10:45 p.m. with Dan Cosentino, Carol Romanelli, and Mary Ellen Setlack, and stayed about 15 or 20 minutes until shortly after 11 p.m. Although Deland was not certain that he had seen co-defendant Cozzi in the bar that night, he was certain that he had seen defendant Duarte. Deland first testified that at about 11 p.m. he heard some noise outside and saw some guys running toward the door. He then asked Dan Cosentino if he wanted to leave. Cosentino replied yes, but found his change from the candy purchase missing from the bar. Deland further testified that he first asked bartender Dobis and then asked defendant Duarte, who was sitting next to Cosentino, about the missing money. Duarte told Deland that he hadn't taken the money. Later, Deland testified that his conversation with Duarte had occurred before he heard the noise outside. Deland further stated that he looked through the bar's window and saw a man striking the passenger side window of a car stopped in the middle of the street. Although Deland told Detective Caliendo that night that the man he saw striking the car was Duarte, he testified at trial that he now knew that it wasn't. Deland testified that both the bar and the night were dark, that there were no lights from the gas station next door to the bar, that he couldn't say that the street was well lit, that it was about 50 to 60 feet between the car and the streetlight, and that there were parked cars all around. Deland was wearing a rust-colored suit that night.

Carol Romanelli testified that she came into the bar at about 10:30 p.m., and that the defendants came in a few minutes later. She testified that they were sitting there when some people came in and said there was trouble outside.

Ray Muraski testified that he and his wife Margaret came into Bambi's at about a quarter of 10 or 11 p.m. and stayed about 15 or 20 minutes. He stated that four or five people were at the foozball machine near the window, that he didn't see anyone leave, and that he didn't notice any excitement or anything going on. Margaret Muraski testified that two or three people came into the bar at about 11 p.m., and that there were two couples playing the foozball machine while she was there.

Joseph Mortimer, an employee of the Bureau of Identification of

Illinois, with 30 years experience in fingerprint identification, testified that a latent palm print[1] found on the hood of the car did not match that of defendant Duarte. However, Mortimer further testified that 13 characteristics of a latent thumbprint found on the inside passenger door matched that of defendant Duarte. On cross-examination, Mortimer acknowledged that the prints were not identical due to the number of points of dissimilarity. A latent print found on one of the bats matched that of Dominick Marzovilla.

Philip Sylvester, an Elmwood Park police officer, was the only witness called by defendant Duarte. He testified that while on duty on February 25, 1976, he was using the washroom of the Elmwood Park police station which was immediately adjacent to the cell in which co-defendant Cozzi was being detained. Sylvester heard an individual enter Cozzi's cell and ask how he was doing. At this point in Sylvester's testimony, Cozzi's attorney renewed his objection that the conversation came within the purview of the attorney-client privilege. It was then determined that the unknown person talking with Cozzi was an attorney. The trial court sustained defense counsel's objection to the officer's testimony when the officer testified that the attorney then asked Cozzi "what happened?" Defendant Duarte's counsel then made an offer of proof that, if allowed to testify, Officer Sylvester would testify that in response to the question "what happened?" co-defendant Cozzi stated that he did it, and that "Blank was with me, but he didn't have anything to do with it." According to defendant's counsel, Officer Sylvester also would have testified that he attempted to make as much noise as possible in the washroom, that he didn't stay there any longer than was necessary, and that he reported what he had heard to the detectives in the police department.

After defendant's counsel had completed the offer of proof, the state's attorney inquired whether or not it was being accepted by the court. The following colloquy ensued:

"The Court: It will be accepted by the Court.

State's Attorney: Fine, Judge.

The Court: The offer of proof is, and again may I state that I will not consider the offer of proof as being any evidence against defendant Cozzi."

Bernard Mann was then called to testify by Cozzi's counsel. He testified that he was an attorney who had been called to the police station to represent Cozzi on February 25, 1976, and that he had told Cozzi at that time that he was going to be his lawyer. Cozzi's attorney then asked Mann what Cozzi had told him. Mann replied that Cozzi had told him

---

[1] A latent fingerprint is defined as a fingerprint obtained at the scene of a crime and usually scarcely visible but capable of being developed for study. Webster's Third New International Dictionary 1275 (1976).

that he didn't do it. Officer Sylvester was not recalled to testify as to the conversation which he had overheard.

## I.

Defendant Duarte moved to suppress the in-court identification of Patrick Elliot on the basis that the procedures used were unnecessarily suggestive resulting in a very substantial likelihood of irreparable misidentification. The following alleged pretrial identification procedure improprieties are suggested: (1) the use of custodial photographic identification procedures where a lineup was feasible; (2) the placement of his photograph on the last page of the mug book next to that of previously identified co-defendant Cozzi; (3) the dating of his photograph; and (4) the alleged opportunity of the witness to view him prior to the witness' identification of his photograph. In denying the defendant's motion, the trial court stated:

> "It is the feeling of the Court that the identification process here goes to the weight and credibility to be given the identification testimony."

## A.

At the outset, the defendant contends that the trial court misperceived the applicable law in ruling on the motion, and, by doing so, bypassed the question of whether, under the totality of the circumstances, these allegedly unnecessarily suggestive pretrial identification procedures tainted the witness' in-court identification.

The United States Supreme Court departed from the rule that the manner of an extrajudicial identification affects only the weight, not the admissibility, of identification testimony at trial in *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and in *Gilbert v. California* (1967), 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (*Simmons v. United States* (1968), 390 U.S. 377, 382, 19 L. Ed. 2d 1247, 88 S. Ct. 967). Our supreme court also departed from that rule in *People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152, wherein the court stated:

> "If an accused can support [the] claim [that the confrontation conducted was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law] the evidence of identification is rendered inadmissible and not simply affected as to credibility. [Citations.]" (*Blumenshine*, 42 Ill. 2d 508, 511.)

However, the *Blumenshine* court did not reverse the defendant's conviction on the basis of this court's misperception of the law in ruling on the defendant's motion. Nor did the courts in the other decisions relied on by the defendant find such an error to be grounds for reversal. Our research has not revealed any other decisions in which such a result

obtained. Therefore, we must consider whether the evidence supports the defendant's claim of the use of constitutionally improper procedures.

■■ The impropriety of the pretrial identification procedure is a recognized ground of attack upon a conviction independent of any right-to-counsel claim. (*Stovall v. Denno* (1967), 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967.) The law is clear "that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons*, 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967.) Applying this standard to the present case, we find that the use of the photographic identification procedure and the manner of its use were not unduly suggestive. Furthermore, it is clear that Elliot's identification of the defendant was based upon his observation of him at the scene of the crime.

■■ The defendant, however, contends that the use of a photographic identification procedure when a lineup was feasible was constitutionally improper in light of the discrepancy between Elliot's estimate of the defendant's height and his actual height. There is no legal necessity that an identification of a defendant be made in a lineup. (*People v. Moore* (1974), 17 Ill. App. 3d 507, 510, 308 N.E.2d 210.) The practice of showing photographs of suspects to witnesses has been approved as essential to effective law enforcement. (*People v. Brown* (1972), 52 Ill. 2d 94, 99, 285 N.E.2d 1.) Although our supreme court has expressed its disapproval of the use of photographs when a suspect is in custody and a lineup is feasible (*People v. Holiday* (1970), 47 Ill. 2d 300, 307, 265 N.E.2d 634; see also *People v. Jackson* (1973), 54 Ill. 2d 143, 148, 295 N.E.2d 462), the court did not establish a per se rule prohibiting the use of photographs under these circumstances. Rather, the court's position was that such practices are undesirable as they carry with them implications regarding the genuineness of the identifications which follow. Those implications may dissipate under the totality of the circumstances, particularly where the independence of the in-court identification is established. *People v. Jackson* (1973), 54 Ill. 2d 143, 295 N.E.2d 462.

■■ Applying these principles to the instant case, we initially do not believe that the discrepancy in the witness' estimate of the defendant's height mandated the use of a lineup. The witness testified that he observed the defendant as he was walking toward the car, as he was catapulting over the hood, and as he was crawling into the car. Thus, the discrepancy in the witness' description of the height of the defendant and his actual height may be attributed to the fact that the witness had a limited opportunity to observe the defendant in a standing position. The defendant does not assert any other discrepancies in the witness'

description to support his claim that the use of the photographic identification procedure affected the genuineness of the witness' in-court identification. Moreover, as discussed more fully later, we believe that there was sufficient evidence to establish the independent origin of the in-court identification, thereby dissipating any effect the use of photographs, rather than a lineup, may have had on the witness' pretrial identification.

The defendant next contends that the manner in which his photograph was displayed to the witness was so unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Although it has been noted that the danger of an incorrect identification will be increased if the police display the pictures of several individuals in such a way as to emphasize a single individual (*Simmons*, 390 U.S. 377, 383, 19 L. Ed. 2d 1247, 1252, 88 S. Ct. 967. P. Wall, Eye-Witness Identification in Criminal Cases 74-75 (1965)), or if they show a suspected accomplice after a viewing of the first suspect, either alone or together with the first suspect (*Blumenshine*, 42 Ill. 2d 508, 512), each case involving pretrial initial identification by photographs must be considered on its own facts (*Simmons*, 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967).

■■■ In the instant case, the defendant first complains of the presence of the date on which the identification was made on his photograph. In light of the fact that the witness testified that he did not notice the date on the photograph, we fail to see how its mere presence can be successfully claimed to have had an effect on the witness' identification. The answer is that it cannot. (See *People v. Hart* (1973), 10 Ill. App. 3d 857, 294 N.E.2d 63.) Moreover, while an opportunity for an impermissible foreseeable encounter with the defendant may have existed when Elliot arrived at the police station due to the proximity of time and space (see *People v. Hatcher* (1977), 45 Ill. App. 3d 374, 390, 359 N.E.2d 1157), the record does not clearly establish that such an encounter occurred prior to the witness' identification of the defendant's photograph. The witness' statement that "I saw him before I looked at the Mug Book, before I saw him on February 23rd" on which the defendant relies is equivocal and subject to many interpretations. In light of the witness' later testimony that he had seen the defendant after he had viewed the photographs, we find the former statement insufficient to support the defendant's claim. Finally, although the defendant's photograph was placed on the same page of the mug book as that of co-defendant Cozzi, there is nothing in the record to suggest that the police in any way indicated to the witness that the defendant was a suspect or even that any suspect's photograph was included in the display. Even if the witness had been told that the police had a suspect and that he was included in the display, we would not necessarily have found the procedure unduly suggestive. (See *People v. Moore* (1979), 73 Ill. App. 3d 510, 516, 392 N.E.2d 64.) Under these

circumstances, we do not find the mere presence of the defendant's picture on the same page as that of the co-defendant sufficient to conclude that the procedure gave rise to a very substantial likelihood of irreparable misidentification.

### B.

■■■ However, even assuming *arguendo* that the pretrial procedure was unnecessarily suggestive, the in-court identification may nevertheless be admissible if from the totality of the circumstances it is shown by clear and convincing evidence that the in-court identification was based on observations of the defendant other than during the arguably improper identification procedure. (See *United States v. Wade* (1967), 388 U.S. 212, 239-40, 18 L. Ed. 2d 1149, 1164, 87 S. Ct. 1926; *People v. Stringer* (1972), 52 Ill. 2d 564, 568, 289 N.E.2d 631.) The burden is on the State to establish by clear and convincing evidence that the in-court identification was not tainted by the allegedly illegal procedure but rather was of an independent origin. *People v. Hatcher* (1977), 45 Ill. App. 3d 374, 388.

■■ Reliability is the linchpin in determining the admissibility of identification testimony. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 97 S. Ct. 2243.) In assessing the reliability of an identification, the court must weigh the corrupting effect of the allegedly suggestive identification itself against the indicators of a witness' ability to make an accurate identification. (*Manson*, 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243; *Manson*, 432 U.S. 98, 129, 53 L. Ed. 2d 140, 163, 97 S. Ct. 2243 (Marshall, J., dissenting).) The indicators of a witness' ability to make an accurate identification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the length of time between the crime and the confrontation. *Manson*, 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243.

■■ Elliot testified that he observed the defendant for approximately one to two minutes as he walked from in front of Bambi's toward the victim's car, as he struck the passenger side of the windshield, and as he crawled into the front seat of the car. He further testified that he had an unobstructed view of the crime scene from his bedroom window which was only about 55 feet from the victim's car. Detective Caliendo's testimony that the scene was well lit was supported by Elliot's testimony that there were two streetlights lit at the time and that the Miller's sign provided a strong light source. Although Elliot testified that he had telephoned the police as he watched the occurrence, his testimony as to how he looked through the four-inch opening in the window to the car suggests an absence of any distracting circumstances and an opportunity for a concentrated degree of attention. The only inaccuracy in Elliot's prior identification was the defendant's height. As noted previously, that

inaccuracy may be attributed to the defendant's movements throughout the occurrence. There is nothing in the record to suggest that Elliot demonstrated any uncertainty in his identification of the defendant's photograph which he viewed only about two days after the crime. Under these circumstances, we are of the opinion that Elliot was close enough for a sufficient length of time under conditions adequate for observation, and thus had the opportunity to see, observe, and later be able to make a positive in-court identification. (See *People v. Doss* (1975), 26 Ill. App. 3d 1, 16, 324 N.E.2d 210.) Thus, regardless of any alleged suggestiveness of the pretrial identification procedure, we find that Elliot's in-court identification was properly admitted.

## II.

The defendant next contends that the State failed to prove him guilty of the murder of Patrick Garrison beyond a reasonable doubt. He claims that a reasonable doubt was raised by (1) Ronald Deland's testimony placing the defendant inside Bambi's at the time of the occurrence; (2) the failure to find the defendant's fingerprints on the baseball bat; (3) the failure to match the palm print found on the hood of the car with the defendant's; and (4) by the circumstances under which Elliot witnessed the events.

We first observe that Deland's testimony was conflicting in several respects. Although he first stated that he was talking to the defendant when he heard the occurrence outside, he later stated that this conversation occurred before he heard the noise outside. Secondly, although he stated at trial that the person he saw striking the passenger side of the window was not the defendant, he had given a statement to the police shortly after the crime in which he had stated that that person was the defendant. The trier of fact determines the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*People v. Carroll* (1977), 45 Ill. App. 3d 1063, 1067, 360 N.E.2d 491.) We are of the opinion that the discrepancies in Deland's testimony could readily cause one to question his credibility and to afford it little, if any, weight. A finding of guilt will be disturbed only where the totality of the evidence is so unreasonable, improbable, and unsatisfactory as to leave a reasonable doubt as to the defendant's guilt. (*People v. Catlett* (1971), 48 Ill. 2d 56, 64, 268 N.E.2d 378.) Considering the remaining evidence discussed below, we find Deland's testimony insufficient to cause us to interfere with the trial court's finding of guilt.

It has often been held that the identification testimony of a single eyewitness is sufficient to convict if the identification is positive and the witness is credible. (*People v. Catlett* (1971), 48 Ill. 2d 56, 63, 268 N.E.2d 378; *People v. Doss* (1975), 26 Ill. App. 3d 1, 324 N.E.2d 210.) We have

previously determined that Elliot's identification of the defendant satisfied the test of a positive in-court identification despite the minor discrepancy in his initial description. There is nothing in the record to suggest that this witness was not to be believed.

Finally, the absence of the defendant's fingerprints on the bat and his palm print on the car supports either the conclusion that they were not there because the defendant did not commit the crime or the conclusion that the defendant's prints were simply not recovered. Considering Elliot's positive identification testimony and the presence of defendant's thumbprint on the outside of the passenger car window, we find the latter conclusion more tenable.

■■ We are satisfied there is sufficient evidence which if the trial court elected to believe, supports the finding of guilt beyond a reasonable doubt. For all of the foregoing reasons, we are of the opinion that the State sustained its burden of proving the defendant guilty beyond a reasonable doubt.

### III.

The defendant next contends that the trial court committed reversible error in excluding Officer Sylvester's testimony concerning the conversation he overheard between co-defendant Cozzi and his attorney. The State responds that the evidence was admitted and considered by the court, and, therefore, that the defendant's argument is devoid of any merit. The State suggests that the excerpt from the trial record quoted on page 7 of this opinion supports its argument. Our review of the trial record causes us to conclude that the trial court was accepting the offer of proof, not as evidence, but for the record so as to preserve, for review, defendant's position.

■■ In order to evaluate this issue we must first consider the purpose of an offer of proof. It is to initially indicate to the trial court and opposing counsel, out of the presence of the jury, the substance of the evidence expected to be offered, so that opposing counsel may object to, and the court may rule on, the admissibility of the evidence presented in the offer of proof. (See *People v. Robinson* (1977), 56 Ill. App. 3d 832, 837, 371 N.E.2d 1170; *Peluso v. Singer General Precision, Inc.* (1977), 47 Ill. App. 3d 842, 854, 365 N.E.2d 390; *Algozino v. Welch Fruit Products Co.* (1951), 345 Ill. App. 135, 142, 102 N.E.2d 555.) If the trial court sustains an objection to the evidence presented in the offer of proof, it then serves to preserve the evidence for a reviewing court's determination of the propriety of the trial court's ruling. (See *People v. Brown* (1975), 27 Ill. App. 3d 569, 577, 327 N.E.2d 51.) Of course, in a bench trial the primary purpose of an offer of proof is to preserve the record for the offeror.

■■ Although our experience teaches us that offers of proof are often

made by the attorney's recitation of the testimony which he expects to elicit from the witness, we suggest that this method be used only when the witness is unavailable and the offer is sufficiently specific. (See *Chicago City Ry. Co. v. Carroll* (1903), 206 Ill. 318, 328-29, 68 N.E. 1087; McCormick §51, at 112 (2d ed. 1972); R. Hunter, Trial Handbook for Illinois Lawyers §77.10, at 795 (4th ed. 1972).) We make this suggestion because if it is determined that the witness' testimony as recited by the attorney in his offer of proof is admissible, the witness must then be called to testify to the facts previously presented in the offer of proof, for it is fundamental that the attorney's recitation of the witness' testimony cannot be considered by the court or jury as evidence. First, the attorney's recitation is merely what he expects to elicit from the witness. What the attorney expects and what in fact the witness testifies to may be two entirely different matters. (See *Schmitt v. Chicago Transit Authority* (1962), 34 Ill. App. 2d 67, 76-77, 179 N.E.2d 838.) Secondly, to accept the attorney's recitation as evidence would deprive opposing counsel of the opportunity to cross-examine the witness.

When defendant called Officer Sylvester, Cozzi objected to the testimony on the basis that it violated the attorney-client privilege. The trial court sustained the objection and the offer of proof followed. Thus intertwined with the question of the offer of proof is the interesting question concerning the attorney-client privilege as to co-defendant Cozzi.

■■ The attorney-client privilege exists in order that one who is, or seeks to become a client, may consult freely with counsel without fear of compelled disclosure of information communicated by him to the attorney whom he has employed or seeks to employ. (*People v. Adam* (1972), 51 Ill. 2d 46, 48, 280 N.E.2d 205, *cert. denied* (1972), 409 U.S. 948, 34 L. Ed. 2d 218, 93 S. Ct. 289.) The essentials of its creation and continued existence have been defined as follows: "(1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived." (*People v. Adam* (1972), 51 Ill. 2d 46, 48, 280 N.E.2d 205; 8 Wigmore, Evidence §2292 (McNaughton rev. 1961).) The one who asserts the privilege has the burden of proving it; the mere assertion that the testimony is barred by the attorney-client privilege is not sufficient. *Shere v. Marshall Field & Co.* (1974), 26 Ill. App. 3d 728, 730, 327 N.E.2d 92.

Bernard Mann, called by Cozzi after defendant's offer of proof, testified that he was an attorney who was called to the police station on February 25, 1976, to represent Cozzi. There is nothing in the record to

suggest that Mann was acting in a capacity other than as Cozzi's attorney. From Mann's further testimony it is also apparent that his conversation with Cozzi at the police station related to the murder of Patrick Garrison. Thus, the record establishes that client Cozzi sought legal advice from an attorney in his capacity as such and had a conversation with him relating to that purpose.

■■ However, the defendant contends that this conversation was not made in confidence because of the fact the washroom adjoined the cell and it is "presumed" that the conversation could be heard in the washroom. We do not think the following cases, suggested by defendant, support his position: *Scott v. Aultman Co.* (1904), 211 Ill. 612, 71 N.E. 1112; *People v. Cooper* (1954), 307 N.Y. 253, 120 N.E.2d 813. There is nothing in the record establishing that co-defendant Cozzi either in fact heard the officer, or saw him enter the washroom at any time prior to or during his conversation with his attorney. Under these circumstances, we are of the opinion that the record fails to support the defendant's claim that co-defendant Cozzi did not have a reasonable belief that his conversation was had in confidence. To find otherwise on the facts presented in this case would virtually destroy the ability of a client to consult freely with his attorney while in custody.

■■ Moreover, it is generally agreed that the attorney-client privilege is the client's and his alone to assert. (McCormick, Evidence §96 at 195 (2d ed. 1972).) Cozzi's defense counsel asserted the attorney-client privilege as a bar to the officer's proffered testimony as to Cozzi's statement to Mann, "Yes, I did it. Blank was with me, but he didn't have anything to do with it." The trial court stated that this testimony as recited by the defendant's counsel would not be considered against co-defendant Cozzi. Relying on *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, and *Lanza v. New York State Joint Legislative Com.* (1957), 3 N.Y.2d 92, 143 N.E.2d 772, the defendant maintains that under these circumstances his sixth and fourteenth amendment right to present a defense should take precedence over Cozzi's right to prohibit the disclosure of his confidential conversation with his attorney. We disagree.

Error in the exclusion of evidence is committed only if the evidence is material and relevant; the offering party has the burden of showing relevance and materiality (*United States v. Bookie* (7th Cir. 1956), 229 F.2d 130, 133). In *Chambers*, the supreme court held that the defendant's right to cross-examine a witness and to admit into evidence that witness' hearsay confession to the murder for which the defendant had been charged took precedence over certain State evidentiary rules where such evidence was critical to the defendant's defense, was corroborated by other evidence and offered under circumstances that provided considerable assurance of reliability, and where the witness was subject to

cross-examination by the State. (*Chambers*, 410 U.S. 284, 294-303, 35 L. Ed. 2d 297, 308-13, 93 S. Ct. 1038, 1045-49; *cf. People v. Craven* (1973), 54 Ill. 2d 419, 427-29, 299 N.E.2d 1.) In *Lanza*, the privileged communication was sought by a legislative committee investigating parole administration; it was not sought for the purpose of using it in court as evidence for or against a criminal defendant.

In the instant case, Officer Sylvester would have testified that although Cozzi gave a name, he could not understand it, hence the use of the term "Blank" to describe the person with Cozzi at the time. There is nothing in the record establishing whether the defendant was or was not that unknown person. Cozzi did not testify at the trial. Under these circumstances, we are of the opinion that the defendant has not only failed to satisfy the high standards of *Chambers*, but also has failed to sustain his burden of proving even the materiality and relevancy of co-defendant Cozzi's statement to his defense.

■■■ Even assuming relevancy and materiality had been established, a police officer's repetition of a co-defendant's out-of-court statement implicating another defendant is hearsay when the statement is being used to prove the truth of the matter asserted in the statement. (*People v. Allen* (1976), 36 Ill. App. 3d 821, 827, 344 N.E.2d 825.) It is well settled that an extrajudicial statement is admissible only against the defendant making it. (*People v. Clark* (1959), 17 Ill. 2d 486, 490, 162 N.E.2d 413.) Where, as here, admissible and inadmissible testimony are included in an offer of proof, the entire offer may be rejected. *People v. Robinson* (1977), 56 Ill. App. 3d 832, 37 N.E.2d 1170.

■■ Finally, although co-defendant Cozzi waived his attorney-client privilege by calling Mann to testify to the same conversation (see 8 Wigmore, Evidence §2327 (McNaughton rev. 1961)), the defendant did not seek to reopen his case to recall Officer Sylvester. The defendant thereby waived his argument that the attorney-client privilege had been waived by co-defendant Cozzi.

For all of the foregoing reasons, we find that Officer Sylvester's testimony was properly excluded by the trial court. The judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P. J., and HARTMAN, J., concur.