(No. 44983.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDDIE JACKSON, Appellant.

*Opinion filed April 2, 1973.*

144

GOLDENHERSH, J., dissenting.

BRUCE STRATTON, Illinois Defender Project, of Ottawa (JOHN L. BARTON, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield (JAMES B. ZAGEL and THOMAS E. HOLUM, Assistant Attorneys General, of counsel), for the People.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

Eddie Jackson was found guilty of armed robbery after a bench trial in Will County and was sentenced to five to ten years imprisonment. The Appellate Court for the Third District affirmed his conviction (*People v. Jackson (1972), 3 Ill. App. 3d 574*, one justice dissenting), and we granted leave to appeal.

Defendant Jackson contends that he was not proved guilty beyond a reasonable doubt, complaining particularly of the procedures which resulted in his identification by the robbery victim.

On February 13, 1968, at approximately 11:00 P.M., Lloyd Downs was preparing to close the Wareco service station in Joliet, where he was a part-time employee. He had been working about twelve hours that day: eight hours at the Illinois State Penitentiary, where he was a guard, and since 7:00 P.M. at the service station. He was mopping the floor and saw three Negro men come through the door toward him. As Downs turned and asked if he could help them, the first man grabbed and pulled him forward, striking him across the jaw with a night stick. Downs fell backwards and the three men hauled him into a restroom, where he lay face down on the floor. One of the three placed a foot on Downs' neck and a voice told him to keep looking down or they would blow his head off. Downs had seen no firearms, but had noticed that the second man through the door was carrying an object that could have been a pipe or a gun. After removing his money changer, keys, wallet, and a roll of currency in his pocket, two of the robbers proceeded to empty the cash register, while the third remained in the restroom guarding Downs. The men left after three to five minutes and Downs immediately telephoned the police to report the robbery.

The next evening Downs went to the Joliet Police Department, where he was interviewed by Detective William Loscheider and was shown a number of mug books. Detective Loscheider testified that Downs described his assailant as a male Negro with a light complextion in his late teens or early twenties. He was approximately five feet ten inches in height, had a slim build, and his hair was long, greasy-looking and straightened, and was covered, for the most part, by a black bandana. The man used his left hand in striking Downs and the club he used was a black, military-type night stick with which Downs was familiar from his own Air Force service. Downs was

shown between 1,200 and 1,500 photographs and made no identification of the robbers. Defendant's picture was among those he viewed, but that photograph was then approximately two and one-half years old and depicted defendant with short, kinky hair, rather than the long, straightened hair style he wore at the time of the events in question. During the interview, Downs described individual facial features of the first robber, as he and Detective Loscheider constructed a composite picture of the man.

About ten days later Detective Loscheider brought a black night stick, which he had obtained during a consent search of the defendant's apartment, to the service station and showed it to the complaining witness. Downs stated that it was similar to the one used during the robbery. Detective Loscheider then left and returned shortly thereafter with four black and white photographs of young Negro males: two mug shots of unnamed individuals and two snapshots which he had taken that night of defendant Jackson and Roy Milton Curry. Curry was described by a number of defense witnesses as bearing a strong resemblance to the defendant. These four photographs were exhibited to Downs, who stated that the photograph of the defendant "looked like the man" who robbed him. Because Downs could not be positive from the black and white picture, Detective Loscheider left again and returned one-half hour later with a single color snapshot of the defendant. Upon viewing this photograph Downs informed Detective Loscheider that "that was the man," but that he would like to view him in person. During these photographic procedures the defendant was in police custody.

Five days later the police conducted a lineup for Downs at the Will County jail, consisting of five Negro subjects, among whom were defendant and Curry. Downs positively identified defendant Jackson as the man who struck and robbed him, and he repeated his identification at trial.

The defendant testified in his own behalf that he was

at the home of his mother and step-father between the hours of 8:00 P.M. and 1:30 A.M. on the night in question, and this testimony was supported by that of his wife, mother, and a friend of his step-father. Their testimony was substantially unimpeached under cross-examination. The State stipulated that his step-father, who was then in the hospital, would also so testify.

Defendant argues that the photographic procedures used were so suggestive as to lead to an irreparable misidentification, and he cites *People v. Holiday (1970), 47 Ill.2d 300,* as support for this contention. He claims that the display of new evidence in the form of the black night stick to Downs, in effect, "primed" him for an identification. This was followed immediately by photographs of the defendant, first in a group of four and then alone, which resulted in defendant's identification by the complaining witness. While we agree that this procedure is ordinarily undesirable, we cannot conclude that it gave rise to a "very substantial likelihood of irreparable misidentification," considering the complainant's opportunity to observe defendant when he first entered the station. *Simmons v. United States (1968), 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971.*

The four black and white photographs first shown to Downs on February 24 were two standard-format mug shots along with two recent snapshots of the defendant and Curry. The fact that Detective Loscheider was able to immediately obtain a fresh color picture of the suspect in whom Downs had indicated interest could easily lead to a belief that this individual was then in custody. The belief by a witness that police attention has narrowed to an individual can be a strongly suggestive influence in making an identification. (See *United States v. Wade (1967), 388 U.S. 218, 235, 18 L. Ed. 2d 1149, 1162, 87 S. Ct. 1926, 1936.*) Just as the photograph is indispensable in the investigatory phase of a criminal case, its inherent limitations are severe as the prosecutorial stage is reached, and

we have said that photographic identification procedures ought not to be employed when the subject is in custody and a lineup is otherwise feasible. (*People v. Holiday (1970), 47 Ill.2d 300, 307.*) We note that the State offers no extenuating circumstances justifying the use of this photographic identification.

However, in order to determine whether the complaining witness's in-court identification of the defendant was properly received, we must examine the totality of the circumstances. (*Holiday, 47 Ill.2d at 307.*) Downs testified that he saw the three men come through the door of the station and estimated that it took five seconds for them to reach him. After the time he was struck and dragged into the restroom, he was not able to see their faces. He readily admitted that he would be unable to recognize the second and third men; he only looked at the first man through the door. He was able to give a description of the assailant and the weapon to police, and this description differed from that of the defendant only in a discrepancy of three inches in height. The defendant is five feet, seven inches tall, weights one hundred thirty pounds, and is left handed; the assailant used his left hand to strike Downs with the night stick. The complaining witness made no inconsistent identifications, and the photograph of the defendant, which he failed to identify on the evening following the robbery, was substantially different from the defendant's physical appearance at the time of the occurrence. At both photographic showings on February 24, complainant proceeded cautiously and refused to make a positive identification without seeing defendant in person. Both the photographic and later corporeal identifications took place within two and one-half weeks of the crime, when Downs' memory can be expected to have been reasonably fresh. Considering all these factors, we believe that Downs' opportunity to observe the defendant during the robbery was adequate to provide a basis for the in-court identification independent of the photographic procedures.

Finally, the defendant argues that the trial court did not give sufficient weight to the testimony of his alibi witnesses and that their testimony raises reasonable doubt of his guilt. There is no obligation on a trial court to believe alibi testimony over positive identification of an accused, even though given by a greater number of witnesses. (*People v. Catlett (1971), 48 Ill.2d 56, 64.*) The trier of fact here was in a superior position to observe the demeanor of these witnesses during examination and to consider their obviously strong interest in exonerating the defendant. We shall not disturb its findings in that regard.

Accordingly, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

MR. JUSTICE GOLDENHERSH, dissenting:

I dissent. The majority concedes that the identification procedure was "unnecessarily suggestive" and that the "belief by a witness that police attention has narrowed to an individual can be a strongly suggestive influence in making an identification." For the reasons stated in Mr. Justice Stouder's dissenting opinion in the appellate court, I believe it to have been impermissibly and prejudicially suggestive and would reverse the judgment.