THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HENRY BRISBON, Defendant-Appellant.

First District (5th Division)    No. 78-1562

Opinion filed September 26, 1980.—Rehearing denied October 28, 1980.

Joshua Sachs, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a jury trial, defendant was convicted of the murders and armed robberies of Dorothy Cerney and James Schmidt (Ill. Rev. Stat. 1971, ch. 38, pars. 9—1 and 18—2) and of conspiracy to commit armed robbery (Ill. Rev. Stat. 1971, ch. 38, pars. 8—2 and 18—2). He was sentenced to a term of 6 to 20 years for the conspiracy and four concurrent terms of 1000 to 3000 years for the murders and armed robberies. On appeal, he contends that: (1) the trial court erroneously refused to examine the jury concerning possible improper influence from a juror who had been dismissed; (2) certain testimony of his jailhouse lawyer should not have been admitted; (3) his photographic identification should have been suppressed; (4) evidence of another crime deprived defendant of a fair trial; (5) he was not proved guilty beyond a reasonable doubt; and (6) he was improperly convicted of the inchoate offense of conspiracy to commit armed robbery and the principal offense of armed robbery.

After jury selection, defense counsel was informed that one of the jurors had been a friend and neighbor of Dorothy Cerney, one of the victims. After opening statements, the prosecutor advised the court that Mrs. Cerney, Dorothy's mother, had confirmed that fact and had said that the juror "should have known Dorothy Cerney and known her well." When the judge questioned the juror concerning her acquaintance with the victim the following transpired:

"THE COURT: How are you doing, Miss Poell? It's been brought to our attention—

516

[THE JUROR]: I want to bring it to your attention.

THE COURT: —you were a neighbor of Cerneys, is that right?

[THE JUROR]: Two doors.

THE COURT: Did you know it at the time? I mean, at the time we were selecting the jury? The question is why didn't you tell us about it at the time?

[THE JUROR]: Well, I was kind of scared because I didn't want to bring it to anyone's attention.

THE COURT: Have you told any of the other jurors this?

[THE JUROR]: No.

THE COURT: Okay. You kept it to yourself?

[THE JUROR]: Yes, it was to myself."

The judge informed the juror that she would be dismissed from the jury and the juror responded, "I could be objective. I'm not very close." Defense counsel twice asked the juror whether she had talked to anyone about her relationship and she responded negatively. Counsel also asked whether anyone had asked her about it and she answered, "No one." The judge told her not to tell anyone why she had been excused and excused the juror. An alternate was advised that he would serve on the jury.

After opening statements, defense counsel moved to have the court question the jury regarding whether the excused juror had spoken to the other members. The court denied the motion because questioning might highlight the matter.

After trial began, a hearing was held on defendant's motion to suppress evidence that John Durr, a witness to a part of defendant's flight, had identified defendant. The State contended that it was not known that Durr could identify defendant until two days before the defense was notified when he made a photographic identification. Defendant objected, contending that the identification should have been known earlier.

An assistant State's Attorney testified that he had interviewed Durr and had shown him a lineup photograph and a composite sketch and that Durr identified defendant. The identification took place on a Saturday after jury selection had commenced. The defense was notified at the next court proceeding. Durr also testified about the circumstances of the identification. Following argument, the court denied defendant's motion.

The testimony at trial established the following pertinent facts. On the night of June 3, 1973, three people were murdered and robbed along Interstate 57 by defendant, David Sanders, Stanley Charleston and Darrell Thompson. Charleston and Thompson testified concerning the events of that night in return for agreed sentences for their participation in the crimes of 12 to 20 years and 20 to 40 years, respectively. On that night the four drove from Chicago to Kankakee in Sanders' Subaru where they intended to party, get high, and rob a pizza parlor. They obtained a

shotgun from a friend in Kankakee. They drove around for a while and decided not to rob a pizza parlor because of police activity. Instead, they decided to rob some white people near a country club but could not find any victims. They had started back to Chicago on Interstate 57 when defendant suggested "bumping" cars off the expressway and then robbing the occupants when they got out to assess damages. Thompson was to drive away in the victim's car. The others agreed to defendant's plan.

The first car that they bumped was a black Chrysler driven by Doris Bell on the exit ramp at Manteno. When she got out of the car, defendant and Sanders walked up to her. Defendant pointed the shotgun at her and told her to get into the car and "scoot over." She replied that God would protect her, walked to her car, and drove away. Sanders yelled at defendant for not killing her.

The four drove north for about 10 minutes before hitting a green Chevrolet driven by Betty Lou Harmon. After she pulled over, Sanders and defendant walked up and forced her into her back seat while defendant got into the front seat and Thompson got behind the wheel. Sanders followed in his car with Charleston. Defendant ordered the woman to disrobe and she did so while crying and pleading with him not to hurt her. After driving about a minute, defendant told Thompson to pull over and ordered Mrs. Harmon out of the car. She was naked and was still crying and pleading. She attempted to escape but was caught by Sanders. Defendant took Mrs. Harmon through a trench, across some grass, and over a barbed wire fence. Meanwhile Thompson searched the car for valuables.

About 10 minutes later there was a shot and defendant returned about 5 minutes afterwards to inform the group that he had "killed the bitch" and gotten a "little chump change." Sanders said that that was good and that he wanted to make more money. After a two-day search by her husband and a friend, Mrs. Harmon's body was found in a cornfield. Medical testimony established that a shotgun barrel had been placed within her vagina and then discharged. She also had a shotgun wound in her neck which was the cause of her death.

They continued their drive to Chicago with three of them in Mrs. Harmon's car and Charleston in Sanders' car. About 5 or 10 minutes later, they hit a red car occupied by Dorothy Cerney and James Schmidt, the victims in the instant case. Schmidt and Sanders approached each other when defendant lifted the shotgun at Schmidt and cocked it. At this time Miss Cerney also got out of the car. The two got over on the grass about 4 to 8 feet from the road and lay on their stomachs with their arms folded across their faces. Pursuant to defendant's order, Thompson took Schmidt's watch and wallet. Defendant told Thompson to get back to Sanders' car. He told the couple to "make this your last kiss" and then shot

each in the back. The four then returned to Chicago to meet at defendant's cousin's house. Charleston was driving Schmidt's car, defendant was in Mrs. Harmon's car, and Sanders and Thompson rode in the Subaru.

Defendant's cousin's house was on Chicago's west side. They drove on the Eisenhower Expressway and defendant sped past the others in Mrs. Harmon's green Chevrolet and exited at Homan Avenue.

A Chicago police officer testified that at about 10:45 p.m. on June 3, 1973, he saw a green Chevrolet speed past his location on the Eisenhower and pursued the car. The car was driven by a young male Negro and was weaving through traffic. As the Chevrolet approached Homan Avenue, it cut across three lanes and over the embankment onto the exit ramp. The officer chased the car but lost sight of it.

On June 3, 1973, John Durr was on his front porch at 3554 West Van Buren between 10:30 and 11 and saw a green car being chased by a squad car. The green car slowed and a man Durr identified as the defendant jumped out and ran through the alley. The car hit a parked car. About 10 or 15 minutes later, defendant returned to the car and removed a shotgun, wrapped the gun in a jacket, and asked Durr to keep it for him. Durr refused. Afterwards Durr and his neighbors looted the green Chevrolet.

Charleston went to the house of defendant's cousin, Venice Brisbon. When defendant arrived, he gave Charleston $11 and told him to get rid of Schmidt's car. Diane Brisbon, another of defendant's cousins, also testified about this conversation. Charleston parked the car between two factory buildings and wiped the steering wheel, the mirror, and the door handles before leaving it.

Diane Brisbon also testified that defendant came to her house, spoke with Charleston, and then told all of his friends what he had done that night. He told her that he had shot a lady between the legs and laughed as he said this.

Venice Brisbon testified that on June 3, 1973, defendant came to her home late in the evening and told her to turn on the news because he had killed some people on the highway. He also told of one woman who had said, "God protect her" and nothing happened to her. He had also robbed and killed another woman, and then a man and a woman.

Patricia Coe, Venice and Diane Brisbon's sister, testified that she had asked defendant about the killing and robbing and was told that there was a lady and some others. He said that one lady told him to take anything but not to kill her. He told Patricia that he put a gun between her legs and shot her. Defendant smiled as he told Patricia that the woman squirmed. Another woman mentioned something about God, and defendant thought she was crazy and not worth killing. Patricia asked defendant if he had made up the story and he told her "No," that he did it.

Robert E. Lee, Jr., an inmate of Stateville Penitentiary in October

1975, testified at trial. While in prison he had a job as the law librarian and helped inmates with their matters in State and Federal courts. In mid-October 1975, he met defendant who had requested legal assistance. He spoke to defendant for about two hours on that occasion. Two or three days later he met with defendant, and defendant asked Lee why he was in jail. Lee responded that he was serving a 20- to 50-year sentence for murder. Defendant asked if Lee had heard about the I-57 murders, and Lee said that he had not since he had been in custody since 1970. Defendant told Lee that he and three "rap partners" were going down I-57 "bumping into cars pulling the people out of their cars and executing them." He told Lee of an older white lady who got back into her car and left and then detailed the killings of the other three victims. Lee said that defendant was "laughing, smiling, joking" while he told Lee about the murders and told him that he enjoyed degrading white women. At this point Lee left. Lee eventually described the murders to a medical technician who passed the information on to the police.

After advising defendant of his rights, State police officers explained that they were investigating a homicide that occurred on I-57. Defendant indicated that he was willing to talk. Defendant said that he had received a call from friends asking him what they should do with the proceeds from the robbery. He asked the officers what they could "do for him" but they told him that they were only investigators. Defendant told the officers that his friends had told him what had happened and then gave a detailed account of the events of the night of June 3, 1973. Three days later the investigators asked defendant for corroborating information such as a weapon. Defendant told them that a friend was holding the shotgun and his mother would bring it. The gun was not recovered because the man had allegedly gotten rid of it.

Defendant's mother met with the investigators on the next day and went to speak to defendant. In response to questioning defendant gave the investigators several names, including "Stanley," David Sanders and "Durrell" (Darrell Thompson). He identified photographs of Sanders and Stanley Charleston and suggested that his mother might have one of Darrell Thompson. Defendant again asked what the investigators could do for him and they told him they had to check the information and speak to the State's Attorney's Office. Defendant told them to bring someone to whom he could talk.

Defendant spoke to an assistant State's Attorney and admitted giving a statement about the I-57 murders to the police. In response to questioning defendant again gave details of the murders. Defendant first said that he learned of the killings from friends but later admitted that he had been there and gave his version of the events. He claimed that his only involvement with the murders was that he drove the car at the time of the first

murder. He said that Sanders shot Mrs. Harmon and picked out photos of Sanders and Charleston. He also agreed to get the shotgun.

A police officer contacted Darrell Thompson and Thompson went to the crime lab in Joliet and was fingerprinted. His fingerprints matched prints from documents found in Schmidt's car and on a cigarette package found near Cerney's and Schmidt's bodies. Stanley Charleston also was arrested and gave a statement to the police.

Defendant also described the events of June 3, 1973, to another assistant State's Attorney although he stated that he would rather not have it recorded. His version was consistent with Charleston's and Thompson's trial testimony except that according to defendant, Sanders was the person who took Mrs. Harmon away, and he did not participate in the robbing and killing of Miss Cerney and Schmidt but viewed it from a distance. Defendant was then shown Charleston's confession in which he allegedly named defendant as the shooter. After reading the confession he said "[M]an, you got it all. You got it all right there." Defendant was also told that Thompson had named him as the gunman.

In March 1976, defendant again contacted Robert E. Lee concerning possible defenses at trial, and they concluded that it would be best to stand mute. Several days later, after reading a newspaper article which stated that the case had been broken by a resident of the prison, defendant threatened to have Lee's head cut off if defendant learned that he was the informer.

No witnesses testified in defense. The jury found defendant guilty of both murders, both armed robberies, and conspiracy to commit armed robbery. Defendant was sentenced to four concurrent 1000- to 3000-year terms for the armed robberies and murders and 6 to 20 years for conspiracy. Defendant appeals.

OPINION

I.

Defendant contends that he was denied due process and his right to a fair and impartial jury by the trial court's refusal to conduct an *in camera* inquiry of the remaining jurors to determine whether the excused juror had said anything to them. He asserts that the trial court's acceptance of the assurances of a juror who had lied during *voir dire* that she had not communicated with other jurors totally neglected the court's duty to insure defendant a fair trial. He also maintains that this refusal prevented him from establishing any prejudice on the record and was error in view of the positive showing that the juror knew one of the victims and may have spoken to the other jurors.

A similar situation occurred in *People v. Bailey* (1976), 42 Ill. App. 3d 638, 356 N.E.2d 410. There a prospective juror admitted that she knew the defendant because he had harmed her son in the past. Although she was

excused for cause, another juror, Mr. Zink, who had been present when the excused juror made the statement, was selected and lunched with nine other jurors. Following lunch, defendant moved for a mistrial asserting that the panel could have been tainted by Mr. Zink. The motion for mistrial was denied, and the court excused Mr. Zink. On appeal from the denial of his post-conviction petition, defendant alleged ineffective assistance of counsel because of his appellate attorney's failure to raise the meritorious issue of the trial court's failure to determine *sua sponte* whether Mr. Zink had discussed the juror's statement with the other jurors. Discussing the merits of that issue, the appellate court found no indication in the record that Mr. Zink had reported the statement to the other jurors and therefore held that the trial court had no duty to inquire *sua sponte* whether any improper communication had occurred. On this record there is no indication that the excused juror informed the other jurors of her acquaintance with Miss Cerney and her express denial of such communication appears of record six times. Although defendant motioned for an inquiry of the remaining jurors, in the absence of any showing that a communication took place and in the face of the juror's denial of such activity, the trial court did not err in denying defendant's motion.

This case is unlike *People v. Harris* (1979), 74 Ill. 2d 472, 386 N.E.2d 60, and *People v. Kirkpatrick* (1979), 70 Ill. App. 3d 166, 387 N.E.2d 1284. In *Harris*, a juror who had allegedly indicated a dislike for the defendant was allowed to remain on the jury which found defendant guilty. The juror had denied the accusations of prejudice and that he had spoken to anyone about the defendant. The supreme court noted the juror's denials and found that the trial court's refusal to discharge the juror was not prejudicial to defendant. Here the juror was excused to prevent any possible influence and, as in *Harris*, the trial court was justified in relying on the juror's assurances that she had done nothing improper. In *Kirkpatrick*, a juror who knew the victim's grandfather was allowed to remain on the jury after stating that the remote relationship would not influence his verdict. Here, since the excused juror and Miss Cerney were more than mere acquaintances, she was properly excused to avoid the possibility of improper influence. However, there was no need to pique the remaining jurors' curiosities concerning the juror's removal and thereby highlight the relationship by inquiring whether anything was said by the excused member.

■■ For the same reason the trial court was not required to make any explanation for the juror's removal. (See *People v. Hyche* (1979), 77 Ill. 2d 229, 240, 396 N.E.2d 6, 12.) As in *Hyche*, defendant merely speculates that the excused juror's contact with the jurors biased them against him. Mere suspicion of bias is not evidence thereof so as to disqualify a juror. (*People v. Cole* (1973), 54 Ill. 2d 401, 415, 298 N.E.2d 705, 713; *People v. Hyche*, at

240.) "Before it can be said that jurors have been prejudiced or influenced by prejudicial reports which could disturb their impartiality, facts and circumstances must appear from which it is reasonable to infer that one or more of them had heard or received them." (*People v. Bailey* (1976), 42 Ill. App. 3d 638, 641, 356 N.E.2d 410, 412.) By excusing the juror, the trial court avoided the prejudice which may have occurred had the woman remained on the jury. As in *People v. Rohwedder* (1969), 106 Ill. App. 2d 1, 5-6, 245 N.E.2d 282, 284, the trial court was faced with a situation calling for sound judicial discretion. In light of the juror's denial of communication with the jury, the absence of any evidence of any communication or prejudice to defendant, and the desire to avoid highlighting the relationship, the trial court did not err in denying defendant's motion to conduct an inquiry of the jury.

## II.

Defendant contends that he was denied various constitutional rights by the admission of Robert E. Lee's testimony. He argues that the State cannot be permitted to install an "official jailhouse lawyer" to aid prisoners in gaining access to the courts and then use testimony gained through their meetings to prosecute the "client." He contends that such a practice places too high a price on the exercise of a prisoner's constitutional right of access to the courts.

As defendant concedes in his brief, no objection to Lee's testimony on this basis was made at trial nor did he include the issue in his motion for a new trial. Accordingly, he has waived this issue for review. (*People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227, 231; *People v. Lykins* (1979), 77 Ill. 2d 35, 38, 394 N.E.2d 1182, 1184.) The waiver rule applies to both constitutional and nonconstitutional issues. *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856, 857.

■■ Defendant urges that if this issue is considered waived it should be considered as plain error (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a)) or that the failure to raise the issue at trial should be considered sufficient to have denied him adequate representation of counsel at trial. It must be plainly apparent from the record that an error affecting substantial rights was committed before plain error may be considered as a means to circumvent the waiver rule. (*People v. Precup.*) In addition, the plain error exception can be applied in criminal cases in which the evidence is closely balanced. (*People v. Roberts* (1979), 75 Ill. 2d 1, 14, 387 N.E.2d 331, 337.) It can hardly be argued that the evidence presented at trial was closely balanced, thus foreclosing application of that aspect of the exception in this case. Whether substantial rights were affected by the admission of Lee's testimony so as to require consideration of this issue turns on the merits of defendant's contention. Likewise, whether defendant was

denied effective assistance of counsel by the trial attorney's failure to raise the issue depends on the merits. (See *People v. Bailey* (1976), 42 Ill. App. 3d 638, 640, 356 N.E.2d 410, 412.) We therefore briefly address the merits of this contention.

Defendant contends that the State created Lee's position as prison law librarian in order to comply with the mandate in *Johnson v. Avery* (1969), 393 U.S. 483, 21 L. Ed. 2d 718, 89 S. Ct. 747, and that in order to facilitate the preparation of legal documents by the librarian, full and candid disclosure of incriminating facts must be made by prisoners. He asserts that it is impermissible to allow facts so obtained to be used to prosecute a defendant for to do so would chill the exercise of a basic constitutional right.

■■ Defendant's argument is premised upon a misconception of the rights involved in *Johnson v. Avery*. That case stands for the proposition that prisoners have a constitutional right of access to the courts with which a State may not unreasonably interfere. This was made clear in *Bounds v. Smith* (1977), 430 U.S. 817, 828, 52 L. Ed. 2d 72, 83, 97 S. Ct. 1491, 1498, where the Supreme Court held that the right of access requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. The right involved is that of access to the courts in large part to bring "original actions seeking new trials, release from confinement, or vindication of fundamental civil rights." (*Bounds*, 430 U.S. 817, 827, 52 L. Ed. 2d 72, 82, 97 S. Ct. 1491, 1498.) The prison library or other aid discussed in *Johnson* and *Bounds* is concerned with post-conviction relief and not with legal advice for pending cases or ones which may be brought in the future.

Even if information or evidence learned by the prison lawyer in fulfilling his duties by asserting the prisoner's rights under *Johnson* and *Bounds* were to be privileged as urged by defendant (which contention it is unnecessary to decide), such a privilege would not apply to the instant facts. The record reveals that at the time of his visit to Lee defendant was serving time for an armed robbery and rape conviction. The papers which Lee drafted were presumably related to challenges of those convictions. After seeing those documents and expressing satisfaction with them, defendant asked Lee if he had heard of the I-57 murders. When Lee explained that he had not because he had been incarcerated since 1970, defendant went on to detail the killings. Such a discussion was entirely outside Lee's duties as law librarian, that is to assist in preparing documents for post-conviction relief on the armed robbery and rape convictions. The admissions amounted to nothing more than defendant pridefully boasting of his accomplishments and relying on fear of reprisal to prevent Lee from communicating them to the authorities. Indeed, when defendant discovered that an inmate had helped to break the case, he threatened to kill Lee

if it turned out to be him. The information had nothing to do with the rights sought to be protected in *Johnson* and defendant's reliance on that case is misplaced.

■ We conclude that no error was committed in admitting Lee's testimony and that defendant was not denied effective assistance of counsel by the failure to raise this unmeritorious issue. We therefore find that defendant has waived this issue.

### III.

Defendant contends that the trial court erred in not suppressing evidence of John Durr's identification of defendant which took place after jury selection while he was in custody and a lineup was feasible. He asserts that the trial court did not consider whether the identification procedure was suggestive, but imposed a duty on defendant which required that he should have demanded a lineup to challenge the propriety of the identification procedure.

Although the supreme court has expressed its disapproval of photographic identification procedures when a suspect is in custody and a lineup is feasible (*People v. Jackson* (1973), 54 Ill. 2d 143, 147-48, 295 N.E.2d 462, 464; *People v. Holiday* (1970), 47 Ill. 2d 300, 307, 265 N.E.2d 634, 637), the court did not absolutely prohibit the use of such identification procedures. (*People v. Witted* (1979), 79 Ill. App. 3d 156, 162, 398 N.E.2d 68, 74.) There is no necessity that an identification be made in a lineup (*Witted*; *People v. Moore* (1974), 17 Ill. App. 3d 507, 510, 308 N.E.2d 210, 212), and showing photographs to witnesses is essential to effective law enforcement. (*People v. Brown* (1972), 52 Ill. 2d 94, 99, 285 N.E.2d 1, 5.) Each case must be considered on its own facts, and convictions based on eyewitness identification at trial following pretrial photographic identification will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *People v. Allender* (1977), 69 Ill. 2d 38, 42, 370 N.E.2d 509, 510.

■ Defendant complains that the trial court did not consider whether the identification was impermissibly suggestive but instead required defendant to demand a lineup. However, at trial, defendant did not challenge the identification on the grounds of suggestiveness but on the basis that a lineup should have been held since defendant was in custody and that the information regarding the identification should have been discovered earlier. Therefore, defendant did not fulfill his burden of establishing the illegality of the identification. *People v. Brown* (1972), 52 Ill. 2d 94, 100, 285 N.E.2d 1, 5; *People v. Ramsey* (1979), 77 Ill. App. 3d 294, 297, 395 N.E.2d 973, 976.

■ We find no evidence in the record to indicate that the instant identification procedure was suggestive. At the suppression hearing John Durr

testified that he had seen a composite drawing which he had helped to create at about the time of the crimes, had viewed over 500 photographs, had viewed lineup photographs and three actual lineups, but did not identify anyone as the suspect. Later he saw two lineup photos, one including defendant and one without him. He was not told whom to identify. He selected defendant from the lineup photograph. Such a procedure can hardly be considered suggestive and the trial court implicitly found that it was not. Therefore, the trial court properly denied defendant's motion to suppress Durr's identification.

■■ Even if defendant had established the suggestiveness of the identification, reversal of defendant's convictions would not be required in the instant case. Durr's trial testimony regarding his encounter with defendant on the night of the crimes established an adequate basis for his identification of defendant at trial independent of the pretrial identification *so as to make it admissible.* (*People v. Allender* (1977), 69 Ill. 2d 38, 43, 370 N.E.2d 509, 511; *People v. Jackson* (1973), 54 Ill. 2d 143, 148, 295 N.E.2d 462, 464.) He had an ample opportunity to view defendant when he was asked to take the shotgun. In addition, contrary to defendant's assertion that Durr's identification was crucial to the State's case, we find that it was only a small bit of the evidence against defendant without which defendant's guilt was still proven beyond a reasonable doubt. We therefore find this contention to be without merit.

## IV.

Defendant contends that he was deprived of a fair trial by the repeated references to the hideous manner in which Mrs. Harmon was killed. He notes that he was not on trial for her murder and that the nature of the evidence was so offensive to the sensibilities of the jury that the jury's verdict was hopelessly tainted. Numerous witnesses testified regarding her death and the prosecutors repeatedly referred to her death in both the opening statement and closing argument. Defendant contends that the evidence had no relevance to Miss Cerney's and Schmidt's deaths and was offered only to outrage the jury.

The State contends that the evidence of Mrs. Harmon's robbery and murder was properly admitted to prove one of the overt acts alleged in the conspiracy count and also to establish *modus operandi.* (*People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489, 492-93.) Defendant does not challenge these principles of law but contends that the evidence should not have been admitted because: (1) its prejudicial effect outweighed any probative value (*People v. Cage* (1966), 34 Ill. 2d 530, 534, 216 N.E.2d 805, 807; *People v. Butler* (1971), 133 Ill. App. 2d 299, 302, 273 N.E.2d 37, 39); and (2) the conspiracy count was a sham since the State knew that defendant could not be convicted of the inchoate and the principal offense.

In his brief, defendant notes a series of allegedly improper statements from the record. However, we note that he failed to object to any of these statements at trial and has therefore waived consideration of possible error. *People v. Akis* (1976), 63 Ill. 2d 296, 299, 347 N.E.2d 733, 735; *People v. Trefonas* (1956), 9 Ill. 2d 92, 98-99, 136 N.E.2d 817, 820.

■■ We also find defendant's contention that the conspiracy count was a sham because he could not be convicted of both the inchoate and the principal offense (Ill. Rev. Stat. 1977, ch. 38, par. 8—5) to be without merit. The Committee Comments to section 8—5 (Ill. Ann. Stat., ch. 38, par. 8—5, Committee Comments, at 579 (Smith-Hurd 1972)) clearly state that although a person may not be convicted of conspiracy and the principal offense, prosecution may be had for both offenses at the same trial. (See also *People v. Leemon* (1975), 28 Ill. App. 3d 541, 544-45, 328 N.E.2d 645, 648.) The evidence was therefore properly introduced to prove the conspiracy charge.

■■ Although the manner of Mrs. Harmon's death was admittedly gruesome, in view of the other overwhelming evidence of defendant's guilt of the robberies and murders for which he was being tried, such testimony could not have altered the jury's verdict.

## V.

Defendant contends that he was not proved guilty beyond a reasonable doubt because the evidence at trial depended heavily on the testimony of felons who testified in exchange for lenient treatment. He notes that Charleston and Thompson were his co-defendants and both pleaded guilty to the crimes charged in return for lenient sentences. In addition, he asserts that Lee's testimony was equally unworthy of belief since he was also a felon and stood to have his sentence reduced for his testimony. He contends that because the only participants in the crimes who testified at trial were unworthy of belief the prosecution failed to prove him guilty beyond a reasonable doubt.

■■ Whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is in the province of the jury or court. (*People v. Wilson* (1977), 66 Ill. 2d 346, 349, 362 N.E.2d 291, 292.) While promises of leniency require that accomplice testimony be regarded and considered with skepticism (*People v. Wilson*, at 350; *People v. Yancey* (1978), 57 Ill. App. 3d 256, 262, 372 N.E.2d 1069, 1073), a conviction based on such evidence may stand if the testimony is of such a character as to convince a jury of guilt beyond a reasonable doubt. (*People v. Nastasio* (1963), 30 Ill. 2d 51, 55, 195 N.E.2d 144, 147, *cert. denied* (1964), 377 U.S. 911, 12 L. Ed. 2d 181, 84 S. Ct. 1173.) The jury was fully aware of any leniency which Charleston, Thompson and Lee received for their testimony and found them to be credible. Defendant has not

pointed to any discrepancies in their testimony, which was for the most part consistent. In addition, their testimony was corroborated by the testimony of the other witnesses, defendant's numerous admissions to various people, and other evidence. It would serve no useful purpose to reiterate all of the evidence of defendant's guilt which was introduced at trial. A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or credibility of the witnesses and will not reverse a conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) The jury's verdict was fully supported by the evidence and left no doubt as to defendant's guilt.

## VI.

Defendant's final contention is that he was improperly convicted of both the inchoate offense of conspiracy to commit armed robbery and the principal offense of armed robbery contrary to section 8—5 of the Criminal Code of 1961. (Ill. Rev. Stat. 1977, ch. 38, par. 8—5.) That section provides: "No person shall be convicted of both the inchoate and the principal offense."

The State makes an interesting argument that because the conspiracy entailed more than just the armed robbery of Miss Cerney and Schmidt for which defendant was convicted, the conspiracy conviction should stand. The State notes that among the overt acts alleged in the conspiracy count of the indictment were the bumping of Ms. Bell's car and the murder of Mrs. Harmon. The State agrees that had the conspiracy count charged only the armed robbery of Miss Cerney and Schmidt, the conspiracy conviction would have to be vacated. However, it suggests application of the principle involved in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, that closely related acts will support multiple convictions as long as the offenses are not lesser-included offenses by definition nor based on the same conduct and suggests the conspiracy to rob others than Miss Cerney and Schmidt constituted a separate offense for which defendant could be convicted.

■■■ We do not find the State's argument to be persuasive. The conspiracy count of the indictment charged that defendant agreed with the others to commit armed robbery and alleged the commission of a series of acts in furtherance of the agreement including the bumping of Mrs. Harmon's car and her killing. The indictment charged only one agreement between the conspirators to commit armed robbery and therefore only one conspiracy. "It is the agreement to commit an offense or offenses which defines the scope of every conspiracy and the mere fact that separate overt acts have been committed in furtherance of a single conspiracy does not create a new

conspiracy." (*People v. Burleson* (1977), 50 Ill. App. 3d 629, 633, 365 N.E.2d 1162, 1166.) In *People v. Burleson*, the defendant entered two separate conspiracies on different days, each of which was composed of the three requisites of a conspiracy; intent, agreement and an act in furtherance of the agreement (Ill. Rev. Stat. 1977, ch. 38, par. 8—2(a)), and the court found that he could be found guilty of two separate crimes. Unlike *Burleson*, in the instant case only one agreement was alleged and proven and there was only one conspiracy shown although it included a series of acts. The State's argument would treat the evidence as establishing two separate conspiracies which would support a separate conspiracy conviction for Mrs. Harmon's robbery. However, as discussed, only one conspiracy was charged. Since defendant was found guilty of the principal offense of armed robbery, he could not also be convicted of the conspiracy of which the armed robbery was a part. Ill. Rev. Stat. 1977, ch. 38, par. 8—5; *People v. Lykins* (1978), 65 Ill. App. 3d 808, 810, 382 N.E.2d 1242, 1244, *aff'd* (1979), 77 Ill. 2d 35, 394 N.E.2d 1182.

Accordingly, that part of the judgments of the circuit court finding defendant guilty of two counts of murder and armed robbery are affirmed and the judgment finding him guilty of conspiracy is vacated.

Affirmed in part; vacated in part.

LORENZ and WILSON, JJ., concur.