THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT C. LYKINS, JR., Defendant-Appellant.

Fourth District   No. 14528

Opinion filed November 2, 1978.

Richard J. Wilson and Edward R. Green, both of State Appellate Defender's Office, of Springfield, for appellant.

C. Joseph Cavanagh, State's Attorney, of Springfield (Robert C. Perry and Jane F. Bularzik, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE GREEN delivered the opinion of the court:

After trial by jury in the circuit court of Sangamon County, defendant Robert C. Lykins, Jr., was found guilty of the offenses of felony murder, armed robbery and conspiracy to commit armed robbery and sentenced to a single term of 70 to 150 years' imprisonment. He appeals.

The State confesses error in the entry of judgment on the conspiracy charge. Section 8—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 8—5) states that a person may not be convicted of both the principal offense and the inchoate offense, here armed robbery and a conspiracy to commit that offense. The conspiracy conviction is reversed.

We do not list here defendant's numerous claims of error. Each is discussed in the opinion. Defendant does not dispute the sufficiency of the evidence to support the verdict. Actually defendant admits most of the elements of each offense. His defense depends largely upon the weight the jury would give to his exculpatory testimony. We preface a discussion of the points raised by defendant with only a brief summary of the facts.

The facts stated in this paragraph are not disputed by the parties. In the early morning hours of June 28, 1976, defendant, David Anderson, and Rene Eickmann had gone to a gasoline service station in Springfield. The only other person there was the sole attendant, Kevin Smith. Defendant

hit Smith at least once and then one of the group cut Smith's throat. At least one of the three then took items of merchandise and money from the station and then the three left. Defendant received part of the monetary proceeds taken. The victim was left on the floor, unconscious and bleeding. He remained alive but in a very serious condition for several months and then died.

■ Defendant maintains that the court committed reversible error in refusing his instruction in the form of IPI Criminal No. 5.04, which stated that defendant was not accountable for the conduct of the others if before the commission of the offense he terminated his effort to promote or facilitate it and either -gave "timely warning to the proper law enforcement authorities" or otherwise made "proper effort to prevent the commission of the crime." There was no evidence that he gave "timely" warning to law enforcement officers but the instruction was not refused for that reason.

The evidence in support of the instruction was almost entirely the testimony of the defendant. He admitted being present when plans for the robbery were made but said that he tried to discourage Anderson, who was the instigator, from committing the robbery. He admitted accompanying Anderson to the service station but said that he did so thinking that Anderson would not follow through. The following is the substance of defendant's testimony of the subsequent events. Upon their arrival at the station, Anderson told him that Rene Eickmann, for whom defendant had affection, was in the back room "messing around" with the attendant. He entered the back room, saw Eickmann with her arm around the attendant and, feeling jealous, hit the attendant. As he left the room he saw Anderson with a club in his hand. Anderson told him to put on an attendant's uniform. This reminded him of the robbery plan in which he was to do this and wait on any customers who might come by. He refused and told Anderson that he did not wish to participate in the robbery. Anderson went to the attendant and started hitting him with the club. He screamed at Anderson to stop but Anderson then threatened to kill him. Although he was several inches taller and 20 to 30 pounds heavier than Anderson and had trained as a Golden Gloves boxer, he feared Anderson because Anderson had a club and a knife and had trained for "Kung Fu" combat. He did not remain in the room but was afraid to run away. He was not present when Anderson slit the victim's throat but Anderson told him that he had done this. He did not further participate in the robbery but was afraid to do anything to prevent it. He received part of the proceeds and later shaved his beard at Anderson's request.

Defendant's position is based upon section 5—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975; ch. 38, par. 5—2) which defines the conditions upon which one is accountable for the conduct of another. Subsection (c)

provides for accountability by solicitation, aiding, abetting, agreeing or attempting to aid others and then states that accountability is negated if:

"Before the commission of the offense, he terminates his effort to promote or facilitate such commission, and does one of the following: wholly deprives his prior efforts of effectiveness in such commission, or gives timely warning to the proper law enforcement authorities, or otherwise makes proper effort to prevent the commission of the offense." Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c)(3).

Defendant's theory is that by telling Anderson that he would not participate in the robbery and by screaming at him to stop hitting the attendant, he made "proper effort to prevent the commission of the offense." He argues that the jury could determine that his fear of Anderson relieved him of responsibility to otherwise disengage from the offense. He relies upon *People v. Rybka* (1959), 16 Ill. 2d 394, 158 N.E.2d 17, and *People v. Lacey* (1964), 49 Ill. App. 2d 301, 200 N.E.2d 11, where, in affirming convictions, the court stated that withdrawal from criminal activity by one who would otherwise be criminally accountable is accomplished if that person timely disengages, announces to the others his intention to do so and admonishes them to also withdraw.

However, if defendant's testimony were fully believed, he went to the service station with Anderson at the time of the robbery without ever having had the intent to promote or facilitate the planning or commission of the robbery. Under these circumstances, the withdrawal provisions of section 5—2(c)(3) would not be applicable because he would not have originally become accountable under section 5—2. He would not have been part of any scheme from which he could withdraw. Had the jury believed his version, it should have found him not guilty because of never having been accountable rather than because of his withdrawal.

Even if the evidence was such that the jury believed that he at one time acted with intent to facilitate or promote the offense, defendant's testimony does not support a timely withdrawal. In *People v. Brown* (1962), 26 Ill. 2d 308, 186 N.E.2d 321, the supreme court, in affirming a conviction for felony murder and refuting that defendant's contention that a reasonable doubt existed as to his withdrawal, stated:

"To this need may be added the further requirement that the withdrawal must be timely, that is to say it must be 'such as to give his co-conspirators a reasonable opportunity, if they desire, to follow his example and refrain from further action before the act is committed,' and it must be possible for the trier of fact 'to say that the accused had wholly and effectively detached himself from the criminal enterprise before the act with which he is charged is in the process of consummation or has become so inevitable that it

cannot reasonably be stayed.' (*People v. Nichols*, 230 N.Y. 221, 129 N.E. 883, 886; also see: *Galan v. State*, 44 Ohio App. 192, 184 N.E. 40.) Stated otherwise, withdrawal may not be effectively made from a felony murder when the 'transaction which begets it has actually been commenced.' *People v. Nichols*, 230 N.Y. 221, 129 N.E. 883, 886." 26 Ill. 2d 308, 312-13, 186 N.E.2d 321, 324.

Here, defendant attempted a withdrawal, if at all, after he had hit the victim and while Anderson was clubbing the victim. Thus, the force which was an element of the underlying robbery was already being applied. The robbery had commenced. Furthermore, although defendant testified that he screamed at Anderson to stop the beating and refused to proceed with the robbery, he did not testify that he admonished others not to commit the robbery. In fact, he admitted that he later accepted a portion of the proceeds of the robbery. It is difficult to see how one can withdraw from a felony murder without withdrawing from the underlying felony.

The refusal of the instruction on withdrawal was not error.

■■ Neither was the court in error in refusing defendant's tendered instruction in the form of IPI Criminal No. 25.03, which would have defined the conditions under which defendant would have been exonerated for his conduct if he had been in an involuntarily drugged condition at the time of the occurrence. Any basis for this instruction was also dependent largely upon defendant's testimony. He stated that during the robbery he had abdominal pains, headaches and difficulty in thinking. He also stated that shortly before the robbery, Anderson prepared and gave him a glass of iced tea. His theory was that the jury could conclude that he was unknowingly drugged by this tea because several days earlier Anderson had given him a glass of iced tea and a urinalysis taken later that day showed that he had narcotics in his system. No showing was made that either glass of tea actually had a narcotic in it. The circumstances shown were insufficient to raise any inference that the second glass of iced tea contained a substance that drugged the defendant. Although defendant testified that at the time he was taking a drug called Medrol for his arthritis, he took that substance voluntarily. The instruction was not appropriate.

■ The victim lingered on for several months before he died. Fund drives were started to raise money to pay his medical expenses. Because of this and because the charge was murder, this case and that of Anderson received substantial attention in Sangamon County. For this reason the defendant made a motion for a change of place of trial supported by copies of 20 newspaper articles. The court denied the motion. Only four of the articles mentioned the defendant, with the others being primarily concerned with fund raising for the victim. None were inflammatory.

Only 6 of 34 jurors who were examined on voir dire were excused for cause. Although 11 of the 12 regular jurors selected had heard of the case, all said they could be impartial. Due process does not require that a jury be ignorant of the case. (*Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639.) The request for change of place of trial was properly denied.

During trial, the court granted a request by the State's attorney that the court inquire of the jurors as to whether any of them during the trial had seen or heard anything about the case in the news media. The court indicated that it would not ask any jurors in the presence of other jurors as to what they had heard or seen. Defendant made no objection to this procedure. Four jurors and one alternate responded that they had seen or heard something. Each told the judge that this information would not influence his decision. Defendant maintains that, nevertheless, the court should have inquired as to the nature of the material to see if it were prejudicial. He relies on *People v. Cox* (1966), 74 Ill. App. 2d 342, 220 N.E.2d 7, where this court awarded a new trial where defense counsel presented to the court newspaper articles prejudicial to the defendant but was refused in his request to have the jury examined as to whether any of them had read any of the articles. *Cox* differs from the instant case in that there the articles were shown to be prejudicial and the court refused defendant's request to have the jurors examined.

■■ However, the *Cox* opinion stated that when alerted to the existence of a possibly prejudicial news report, the trial court must ascertain if the article is in fact prejudicial in addition to determining if it were read by any jurors. Here, the court did not *sua sponte* determine whether the information the jurors had obtained was prejudicial to the defendant. On the other hand, ABA Standards, Fair Trial—Free Press §3.5(f) (approved draft 1968) states that when possibly prejudicial material has been disseminated during trial, the court "may" on its own motion and "shall" on the motion of a party, question each juror about his exposure. No case has been called to our attention where a conviction has been reversed without a showing that the reports which jurors saw were in fact prejudicial. Although the trial judge here should have questioned the jurors who had contact with news reports individually to determine if the reports were prejudicial, we do not think that plain error occurred here. Defense counsel did not object to the procedure used at trial and did not cite it as error in his post-trial motion. We rule the error to have been waived.

Patricia Turner testified for the State that she lived with Anderson, Eickmann and defendant in an apartment across the street from the station where the robbery occurred. She stated that on the morning after the robbery occurred she was present in their apartment when defendant

admitted having hit the victim on the head several times. She also stated that she was with the defendant later that morning after his arrest while he was with police officers at the police station and while driving around in a car in search of the knife used to slit the victim's throat and other items connected with the crime. These items had been thrown from the car in which Anderson, Eickmann and the defendant rode after they left the service station after the crime. On cross-examination, counsel for defendant asked her about defendant's condition at the time that they were talking in the apartment, whether he was perspiring, whether his eyes were red, whether he was depressed and whether he *complained of not feeling well.* She answered that he appeared to be nervous. On redirect the State asked her whether at any time that morning, either at the apartment or later with the law enforcement officials, defendant had complained of being under the influence of any "medication or substance of any kind." The defendant made no objection and the witness answered that he had not.

■■ Raising the issue for the first time on appeal, defendant claims that the introduction of this evidence before the jury was plain error. In *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the United States Supreme Court ruled that introduction of post-arrest silence by a defendant as an admission of his guilt is a violation of that defendant's *Miranda* rights. In *People v. Deberry* (1977), 46 Ill. App. 3d 719, 361 N.E.2d 632, we ruled that even pre-arrest silence should be received as an admission of guilt only with caution. Here, however, the defendant had opened the issue of defendant's statements as to his condition on the morning after the occurrence and invited the question asked by the prosecutor (see *People v. Saulsbury* (1977), 55 Ill. App. 3d 663, 371 N.E.2d 165). In *People v. Henson* (1978), 58 Ill. App. 3d 42, 373 N.E.2d 852, we ruled that *Doyle* did not preclude a showing that defendant failed to give an exculpatory story after arrest at a time when he made a purportedly full statement of his participation in a crime. We conclude that this testimony gave rise to no plain error.

■■ Police Officer John Graves testified that a transcript he presented was an accurate record of a 44-minute conversation he had with defendant shortly after the occurrence. The witness testified that (1) he was present during the conversation, (2) the stenographer made a transcript of the conversation shortly thereafter, (3) he checked the transcript for accuracy at that time while his memory was fresh and found it to be accurate, (4) he had recently checked the document and found it to be the one he had previously examined, and (5) he had no present recollection of the details of the conversation. The basis for the admission of the document was established. (McCormick, Evidence §299 (2d ed. 1972).) Defendant argues that the detective could not have a complete recollection of the 44-

minute conversation after the conversation had been concluded and the transcript typed. Because the witness had testified that he checked the transcript for accuracy, his ability to have then done so would go to the weight of his testimony and the accuracy to be given to the document rather than to its admissibility.

■■■ Further claims of error are made for a variety of reasons. The State was permitted to introduce, over the defendant's objection, a photograph of the victim's body taken 3½ months after the incident and shortly after his death. The photo showed scars resulting from a tracheotomy performed after the robbery by doctors who deemed it necessary to aid his breathing. Although the scars were not relevant to any issue before the jury, no reversible error resulted. We also consider to be unmeritorious defendant's argument that in asking defendant if he knew how a knife bearing the name of a neighbor of defendant's got into Anderson's possession, the State was hinting that defendant had stolen the knife.

■■ Preparatory to voir dire, the court explained the law of accountability to the jurors and informed them that Illinois has no death penalty. During questioning, the court asked the prospective jurors if they would follow the law of accountability. Although Supreme Court Rule 234 (58 Ill. 2d R. 234) made applicable to criminal cases by Rule 431 (58 Ill. 2d R. 431) prohibits questioning jurors upon matters of law or instructions, no case has been cited to us ruling it reversible error to do so and we do not determine it to be such here. Informing the jurors that the State had no death penalty enabled the jurors in answering questions to eliminate from their consideration one factor that might cause them to be prejudiced.

Finally, defendant argues that his sentence of 75 to 150 years was excessive and disparate to the same sentence given to Anderson who under the evidence appeared to be the one who actually slashed the victim's throat. In imposing the sentence, the trial judge stated that his reason for making the sentence so long was to impart a message to the Parole and Pardon Board that defendant should never be given parole. Under the law in effect at the time of the offense, defendant would be eligible for parole at the expiration of 20 years, less time credited for good behavior (Ill. Rev. Stat. 1975, ch. 38, par. 1003—3—3(a)). If he were not granted parole, his maximum sentence would extend beyond any reasonable life expectancy even if it were halved. The trial court correctly ascertained that the sole purpose of ordering a sentence of such severity was to emphasize his feelings to the Parole and Pardon Board.

Defendant will have no right to have a release date determined pursuant to section 3—3—2.1 of the Unified Code of Corrections (Ill. Rev. Stat. 1977 Supp., ch. 38, par. 1003—3—2.1) unless we reduce his minimum term to less than 20 years.

■■ The instant murder was a brutal and most senseless one. Even by

defendant's own admissions, he cowardly stood by and permitted Anderson to beat and slash the victim and then left the victim without aid. Although defendant had no prior record, the "seriousness of the offense" (Ill. Const. 1970, art. I, §11) demands a severe penalty. Under the present sentence, the defendant will be eligible for parole in 20 years, less time for good behavior. When the time for parole hearing arrives, the parole authorities will be ruling upon the request for parole in the face of a recommendation of the trial judge who saw the witnesses and heard the evidence that parole be denied. We do not deem the action of the trial judge placing the sentence in this posture to be a breach of discretion. See *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

The conviction for conspiracy entered on that count of the charge is reversed. All other convictions and the sentence are affirmed. The case is remanded to the circuit court of Sangamon County for issuance of an amended mittimus.

Affirmed in part, reversed in part, and remanded.

MILLS, J., concurs.

Mr. JUSTICE REARDON, specially concurring:

I specially concur in this case so as to record my affirmance of the conviction and my disapproval of the sentence imposed.

I agree with the majority opinion which correctly disposes of defendant's numerous claims of error, with the sole exception as to his claims regarding the sentence which was imposed. Defendant was sentenced to a single term of 70 to 150 years.

The statutory law that is applicable to the defendant's sentence is that which was in effect at the time of the imposition of defendant's sentence. Pursuant to that law the defendant, before becoming eligible for parole, must serve for a period of 20 years less good time accumulated. If the defendant, during the period of his penitentiary service, accumulates the maximum amount of good time he will be eligible for parole in approximately 9 years. Under these circumstances it seems clear then that a sentence of 70 to 150 years is totally without meaning. It is urged by some, and my colleagues seem to approve, that a sentence such as the one imposed here is an appropriate vehicle to carry a message to the parole authorities. This position completely overlooks the methods available to the trial judge to express his views.

Under existing law, which was not in effect at the time of defendant's sentencing, section 5—4—1(c) (Ill. Rev. Stat. 1977, ch. 38, par. 1005—4—1(c)), the trial judge is required to state in the transcript of the sentencing hearing his reasons for imposing the sentence. Under the statute

applicable at the time of defendant's sentencing, the judge could have assigned his reasons by dictating into the sentencing transcript the rationale of his sentence. The trial judge could have joined in the statutorily authorized joint statement of the State's Attorney and the judge which accompanies the prisoner to the penitentiary, which would have enabled the parole authorities to have the benefit of the judge's views as to the appropriate period of incarceration before parole should be granted. The tragedy of sentences of the kind imposed here gives substance to the theory that the only purpose of sentence is to punish the offender. This view, in my judgment, is not only a shortsighted one but in effect it violates the spirit and philosophy of our sentencing statutes. The "message to the penitentiary" position undermines the purposes of the sentencing hearing. Literally followed there would be little purpose of engaging in an effort to learn the general moral character of the offender, his mentality, his habits, his social environment, his abnormal or subnormal tendencies, his natural inclination or aversion to commit crime, and the stimuli which motivate his conduct. Sentences, by their very nature, must not only be just but also must be seen to be just. When it is realized that a sentence of this character has no substantial meaning it can only serve to denigrate the entire judicial system.

The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11.) The purposes of the Unified Code of Corrections include the restoration of offenders to useful citizenship and the prescription of criminal sanctions which recognize the rehabilitative potential of individual offenders. (Ill. Rev. Stat. 1973, ch. 38, par. 1001—1—2.) The trial judge is thus charged with the often difficult and delicate responsibility of fashioning a sentence which will not only protect the interests of society, but will also allow for the possibility of rehabilitation of the offender. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

The examples of "the return of the black sheep to the fold" and the experience of Paul on his way to Damascus are, in my judgment, still viable and meaningful even in our troubled society of today. More pragmatically, to deny to a human being the reward for true contrition and purpose of amendment is a venture into a discipline where judges possess no particular expertise. Still more pragmatically, the enforcement of the doctrine of "abandonment of all hope" upon those sentenced to our penitentiaries will only serve to create behavior problems for those in charge of our penal systems and, finally, such sentences will be deemed by many as mere histrionic responses to a current public clamor adding nothing to the enhancement of our judicial system. I quickly add that, although there is no evidence here to so identify this sentence, the critics of it will not be so discerning.