THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD HAMMOND, Defendant-Appellant.

Third District No. 3—90—0397

Opinion filed May 31, 1991.

Robinson & Skelnik, of Elgin (Josette Skelnik, of counsel), for appellant.

Gary L. Spencer, State's Attorney, of Morrison (Judith Z. Kelly, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GORMAN delivered the opinion of the court:

Defendant Ronald Hammond was charged with making a false report of a theft, disorderly conduct and fraud on an insurance company. Tried before a jury, the defendant was found not guilty of falsely reporting a theft and disorderly conduct but guilty of fraud on an insurance company. Defendant was sentenced to probation conditioned upon serving 90 days of work release, ordered to make restitution and pay a fine and costs. Defendant appeals. We reverse.

The defendant was charged by indictment with three offenses. Count I charged that on July 19, 1989, the defendant committed the offense of fraud on an insurance company by falsely representing that he had suffered a loss by reason of a theft during the course of a burglary and, in so doing, had falsely obtained from the insurance company a sum of money in excess of $25. Count II charged that on July 2, 1989, the defendant had committed the offense of making a false report of a theft by knowingly making a false report of a theft to the police with the intent to defraud an insurer. Count III charged that on July 2, 1989, the defendant had committed the offense of disorderly conduct by knowingly transmitting to a police officer a false report that the offense of burglary had been committed. The defendant pleaded not guilty to the charges and demanded a jury trial.

At trial it was undisputed that the defendant's son, Michael Hammond, together with Michael's roommates, Chris Buikema and Steve Prins, had engaged in a scheme to defraud Michael's insurance company by staging a burglary at the house the three men shared and then submitting a false claim for property allegedly stolen in the burglary. It was also undisputed that as a result of his claim to the insurance company, Michael received a check from the insurance company of $5,381.65.

The defendant was not named as an insured on the policy and no evidence was presented that he sought or obtained any proceeds of the insurance money. The defendant was prosecuted on a theory of accountability, with the prosecution contending that he was aware of the scheme to defraud the insurance company from the outset and had assisted in planning and executing that scheme.

A police officer testified that on July 2, 1989, he received a call of a burglary at 1101 Avenue I in Sterling. Upon arriving at the address, he met with the defendant, who indicated that he had been watching the house while his son and his son's roommates were in Wisconsin. The defendant told the officer that when he came to the house, he observed a window on the storm door broken out. When he unlocked the

door and entered the residence, he found that it had been ransacked and called the police. The defendant took the officer through the house, pointing out items that were missing. The defendant estimated the value of the items missing at over $2,000. While examining the house, the officer observed that the door leading into the house from the garage had been kicked open and the lock on it was broken. After speaking to the defendant, the officer reported that a burglary to the residence had occurred.

Cara Nelson, a claims investigator for Ohio Casualty Insurance Company, testified that she received a loss report relating to the burglary and contacted the insured, Michael Hammond, to investigate the claim. Michael had taken out a one-year renter's insurance policy in April 1989. After receiving the loss report, Nelson met with Michael at his home, inspected the premises and took a signed statement from him on July 12, 1989. Michael also provided Nelson with a list of items he claimed were either lost or damaged because of the burglary and photographs of some items he claimed were missing, including a photograph of a large television. Nelson further testified that on July 19, 1989, she drafted and delivered to Michael a check in the amount of $5,381.65 to cover the claimed loss. Michael and Chris Buikema were present at the house when she delivered the check, and the defendant arrived shortly thereafter.

Chris Buikema testified that he and Michael formulated a scheme to stage a burglary at the house and defraud the insurer. In furtherance of the scheme, Buikema rented a storage unit in Clinton, Iowa, under the name Chris Stevens where the allegedly stolen property would be stored. Buikema was the only one who had a key to the storage unit. He subsequently received the refund from the manager when he terminated the lease in August 1989.

Buikema testified that he, Michael and Prins carried out the staged burglary on the weekend prior to July 4, 1989. On June 30, 1989, the three loaded several items of property into the defendant's van, which Michael had use of, and then he and Michael took the property to the storage unit in Clinton. After unloading the property in Clinton, they returned to their residence and messed up the house to make it look as though the house had been burglarized. The following morning he, Michael, Prins, Allen Carter and Michael's cousin Bobby left for Lake Geneva, Wisconsin, to go camping. The group returned to Sterling on Monday afternoon.

Buikema testified that approximately two weeks prior to the staged burglary, he awoke to find the defendant in the living room of their house. A 26-inch television and a Panasonic VCR from the

defendant's house were in the spot in the living room where Michael usually kept his own television and VCR. Initially, Buikema testified that Michael and the defendant were taking photographs of the two items. He later acknowledged that he had not actually seen Michael and the defendant taking these photographs. While the defendant was present at the house, a real estate agent arrived and asked for permission to take interior and exterior photographs of the house, as it was for sale. Michael and Buikema agreed to this, and one of the photographs taken was of the living room containing the defendant's television and VCR. After the real estate agent left, he, Michael and the defendant were "all kind of glad and happy that the guy happened to show up," and the defendant, according to Buikema, told the other two that "it had proof towards the case that we had a 26-inch TV and VCR in our house."

Buikema further testified to several conversations the defendant had with him, Michael and Prins. One conversation supposedly took place three to four weeks prior to the staged burglary, when the defendant told the others about the time there had been a break-in at his home and he had padded the list of stolen items in order to get a bigger check from his insurance company.

Another conversation took place two to three weeks before the staged burglary. The defendant, a minister, related the time the church burned down and the insurance company wanted to settle for $25,000. The defendant claimed to have called an independent adjuster and ended up receiving $75,000 for the loss.

A third conversation took place two weeks prior to the staged burglary. During that conversation, the defendant brought up the idea of the defendant discovering the burglary while the others were in Wisconsin rather than have them discover it after returning home. According to Buikema, the defendant stated "it would look real good having a reverend [sic] discover the robbery [sic]," that he (defendant) would just stop in and discover it accidentally and would report it, and that maybe he would bring another preacher with him as a witness.

Buikema also related another conversation which he claimed took place a few days after July 4, 1989, in which the defendant indicated that after entering the house on July 2, 1989, he put some "finishing touches" on it before he reported the burglary and took with him his camera, which he discovered sitting on Michael's bed.

Buikema testified that he was present when Cara Nelson delivered the insurance check to Michael and that the defendant arrived while Nelson was there. Both Michael and the defendant left the

house together and were "kind of ticked off" when they returned because the bank would not cash the full amount of the insurance check for Michael.

The insurance scam was eventually uncovered when Buikema and Prins began taking Michael's property out of the storage unit without his knowledge and selling it to their friends. Some of this property was recovered by the police, who then took statements from Buikema and Prins. Buikema testified that for his part in staging the burglary he was to receive between $500 and $700 from Michael but had only received a total of $320. He had been charged with the same offenses as the defendant and those charges were still pending.

Steve Prins testified next. He, too, had also been charged with the same offenses as the defendant. His testimony concerning the staged burglary was similar to Buikema's testimony. Prins testified that although he had talked to the defendant three or four times prior to the staged burglary, these conversations were just generalized conversations about how to get money from insurance companies because "I wasn't suppose [sic] to know he knew what was going on." Although at one point Prins indicated to the police that the defendant was not aware of what was going on, he later changed his story and informed the police that the defendant had also been involved in the scam.

At trial the State's Attorney was allowed to read into evidence the entire transcript of the defendant's testimony before the grand jury. In that testimony, the defendant denied that he knew prior to arriving at his son's house that he would find a burglary there and stated that he had only gone there because his son had asked him to put the mail in the house while he was gone to Wisconsin. The defendant testified that he had taken his television and VCR to his son's house about a week before the burglary because his son told him that his own television and VCR were not working properly. His son kept the television overnight because he told his father that he wanted to watch a movie that night with his friends. The defendant was unaware that any pictures had been taken of his equipment.

The defendant stated that he first suspected something was amiss perhaps 7 to 12 days after he discovered the burglary when he went to pick up his son for work and heard his son and Buikema saying something about the insurance settlement. He heard Buikema say "did they go for it?" The defendant then called his son out to the garage and asked him, "[D]id you boys have anything to do with this?" Tears came to his son's eyes and he responded "Dad, whatever you think you musn't [sic] say anything to anyone." His son did not give

him any details then or at any time thereafter. The prosecutor continued to question the defendant about his knowledge and whether it was right to do what he had done. The defendant ultimately conceded that, in hindsight, he displayed bad judgment in failing to take any sort of action after he suspected the scam.

Both the defendant's wife, Jean, and his son, Michael, testified for the defense. Jean and the defendant had been married for 25 years and had two children in addition to Michael, who was 19 at the time of the staged burglary. The Hammonds had asked Michael to leave their home about two years earlier because they did not approve of his lifestyle and felt they no longer had control over his behavior. Jean testified that in addition to his work as pastor of Gospel Tabernacle Church, her husband had been employed in cleaning chimneys and laying carpets. During 1989, Michael had assisted his father in carpet-laying jobs and also did some carpet-laying jobs on his own. He had use of the defendant's van for that purpose.

Jean did not recall any conversation at her house approximately two weeks before the staged burglary concerning the church fire. However, Jean indicated that the fire had been a very traumatic event in their lives and therefore had probably been discussed many times. Jean explained that the fire had been started when lightning struck a wire which then caused an electrical surge into the church. The day after the fire a man from Chicago called and indicated a willingness to help the Hammonds settle their insurance claim. Prior to receiving the call, the Hammonds were not even aware that persons such as adjustors existed. Although they were initially offered $24,000, through the adjustor the amount finally received in settlement of the claim was $74,000.

During cross-examination the prosecutor questioned Jean about how the $74,000 had been spent. The prosecutor asked what additions and improvements the Hammonds had made to the church and whether the Hammonds had made any improvements or additions to their house. Jean denied that they had made any improvements or additions to their house. The prosecutor then inquired about the person who had investigated the church fire, asking "Is he the only person you saw investigate the arson?" Jean replied "The arson?" and the prosecutor stated "I'm sorry, the fire, is he the only person who investigated the fire?"

Michael Hammond testified that the idea to defraud the insurance company originated with Chris Buikema, but that he quickly agreed to it. Michael testified that no one, at any time, had any discussions with the defendant as to how to defraud the insurance company and that

the defendant was in no way involved in the scheme. Michael testified that Buikema had commented that the defendant's discovery of the burglary was the best part of their plan because the defendant did not know about the scheme and therefore his reaction when he saw the house would be genuine.

Michael indicated that, after he received the settlement check, the defendant drove him to the bank and waited while he cashed his check. The defendant then drove him home. Michael gave some of the money to Buikema and Prins and to his girlfriend. He also took a trip to Las Vegas with some of the money.

During closing arguments, the prosecutor advised the jury that if they believed the defendant first found out about the insurance scam after July 2, 1989, they had to find him not guilty of disorderly conduct and false report of a theft. During his closing argument, defense counsel commented that the defendant did not have an obligation to report a crime he was not a party to and asked what parent would turn his own son in for a crime based only on the slightest information. During her rebuttal, the prosecutor advised the jury that this was not an accurate statement of the law.

One of the instructions given was Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. 1981) (hereinafter IPI Criminal 2d) (accountability) and IPI Criminal 2d No. 5.04 (defining "withdrawal"). The jury returned verdicts finding the defendant not guilty of false report of a theft and disorderly conduct and guilty of fraud on an insurance company. No post-trial motion was filed by defense counsel.

■ The defendant contends that the State failed to prove him guilty of the offense of fraud on an insurance company beyond a reasonable doubt. Although this issue was not raised in a post-trial motion, we will review this issue under the plain-error rule. 107 Ill. 2d R. 615(a).

In *People v. Herrett* (1990), 137 Ill. 2d 195, 561 N.E.2d 1, our supreme court stated:

> "The plain error rule permits a reviewing court to consider a trial error not properly preserved for review in two circumstances. First, where the evidence in a criminal case is closely balanced, a reviewing court may consider a claimed error not properly preserved so as to preclude argument of the possibility that an innocent man may have been wrongly convicted. [Citation.] A court will examine the record only to see if the evidence is 'closely balanced.' If it is not, there is no need to consider an error which was not properly preserved for review. [Citation.]

\*\*\*

The plain error rule also may be invoked where the error is so fundamental and of such magnitude that the accused was denied a fair trial. The rule is invoked where it is necessary to preserve the integrity of the judicial process and provide a fair trial." 137 Ill. 2d at 209-10, 561 N.E.2d at 7-8.

"When presented with a challenge to the sufficiency of the evidence, it is not the function of [the reviewing court] to retry the defendant." (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) (106 Ill. 2d at 261, 478 N.E.2d at 277, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) " 'Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' (Emphasis in original.)" 106 Ill. 2d at 261, 478 N.E.2d at 277, quoting 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

▪ The prosecution's theory of the case was that the defendant knew about the scam from the outset, that he assisted his son and the others in planning it and that he agreed to be the one to discover the burglary and report it to the police. During closing arguments, the prosecutor directed the jury that if they believed the defendant first found out about the scam *after* July 2, 1989, then they should find him not guilty of the false report of a theft and disorderly conduct charges. The jury followed the prosecutor's direction. Apparently they did not accept the State's theory that the defendant had knowledge of the scam prior to reporting it and, thus, found the defendant not guilty on the false report and disorderly conduct charges. We believe that the prosecutor's direction, combined with the not guilty verdicts, constitutes a conclusive determination that the defendant did not have knowledge of the scam prior to July 2, 1989.

▪ As the State points out, the jury verdicts are not legally inconsistent. The jury could have found that the defendant did something after July 2, 1989, but before July 19, 1989, to assist Michael in the commission of the crime. This court must examine the evidence to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

There seem to be two actions taken by the defendant after July 2, 1989, which the State seized upon to establish his guilt on the insurance fraud charge. When the defendant overheard his son and Buikema talking, he questioned his son and failed to tell anyone about his suspicions. The second is the defendant's act on July 19, 1989, of driving Michael to the bank to cash the insurance check.

To prove a defendant guilty of an offense by accountability, the State must prove beyond a reasonable doubt: (1) that the defendant solicited, ordered, abetted, agreed or attempted to aid another in the commission of an offense; (2) that the defendant's participation took place before or during the offense; and (3) that the defendant had the concurrent, specific intent to promote or facilitate the commission of an offense. (*People v. Deatherage* (1984), 122 Ill. App. 3d 620, 461 N.E.2d 631.) None of these factors are present in the case at bar.

Assuming the defendant became aware that his son was engaged in an insurance fraud prior to his receipt of the check from the insurance company, defendant's awareness alone does not render him accountable. Neither is the defendant accountable for his son's offense by virtue of his failure to prevent his son from completing the offense or to report his son to the police.

Regardless of the relationship between an offender and a person with knowledge of the offender's commission of an offense, one is not accountable for failing to furnish information to the police about the commission of an offense. Rather, an affirmative act, beyond the mere failure to come forward with information, and beyond even an affirmative denial of knowledge of any information, is required to render one liable. (*People v. Donelson* (1977), 45 Ill. App. 3d 609, 359 N.E.2d 1225; *People v. Thomas* (1990), 198 Ill. App. 3d 1035, 556 N.E.2d 721.) Thus, Illinois imposes no obligation on an individual who has knowledge that an offense has been committed to report the offender to the police.

Moreover, even assuming the defendant suspected or knew that his son had committed an illegal act when he drove him to the bank, that additional fact does not render him accountable for his son's offense. He did nothing to promote or facilitate his son's commission of the offense before its completion. The offense itself was complete when Michael received the check from his insurance company.

The offense of fraud on an insurance company, insofar as it relates to the allegations in this case, is defined as follows:

> "If any person shall obtain or cause to be obtained *** from any insurance company, any sum of money on any policy of insurance issued by any company doing business in this state, ***

or shall falsely obtain, cause to be obtained, or attempt to obtain from such insurance company any sum of money upon any policy of such company, by means of false and fraudulent written representations or affidavits *** that the person insured suffered a financial loss by reason of the loss, theft, damage or destruction of the property insured, every person on conviction thereof, if the sum so obtained, attempted or caused to be obtained shall be equal to or exceed the sum of $25, shall be guilty of a Class 4 felony." Ill. Rev. Stat. 1989, ch. 73, par. 1101.

By the terms of this statute, Michael's commission of the offense of fraud on an insurance company was complete when he obtained the check from his insurance company's representative on July 19. The fact that his father thereafter provided him with transportation which enabled him to cash that check does not render the defendant accountable for the offense where, by that point in time, the offense was already completed. *Cf. People v. Blitstein* (1989), 192 Ill. App. 3d 281, 548 N.E.2d 664 (offense of theft by deception which alleged that defendant obtained by deception control over property of another, to wit, checks or orders for payment of money in excess of $300, was complete when defendant obtained control over a check from the victim, and not when he later cashed the check).

In her closing argument at trial, the prosecutor contended that the defendant was guilty because, after becoming suspicious of his son's conduct, he "did nothing." The prosecutor also told the jury, contrary to the law, that they would not be told that an individual has no duty to report a crime. Moreover, she caused an instruction to be given to the jury which suggested that the defendant did have such a duty which he failed to obey. Thus, the jury were given People's instruction No. 4 (IPI Criminal 2d No. 5.04), which reads as follows:

"A person is not legally responsible for the conduct of another person, if, before the commission of the offense charged, he terminates his effort to promote or facilitate the commission of the offense charged, and wholly deprives his prior efforts of effectiveness in the commission of that offense or gives timely warning to the proper law enforcement authorities or makes proper effort to prevent the commission of that offense."

■ This instruction effectively advised the jury that an accused can be held legally responsible for the conduct of another person if he fails to give timely warning to the proper law enforcement authorities or make an effort to prevent the commission of the offense. However, the IPI Committee Notes to this instruction direct that the instruction

is to be given in conjunction with the instruction defining accountability "when there is evidence of withdrawal." (IPI Criminal 2d No. 5.04, Committee Note.) This instruction, therefore, should be given only where the defendant's defense is that, even though he was initially involved in the offense, he thereafter took steps to terminate his involvement. (See *People v. Lykins* (1978), 65 Ill. App. 3d 808, 382 N.E.2d 1242, *aff'd* (1979), 77 Ill. 2d 35, 394 N.E.2d 1182.) Such an instruction is wholly inappropriate in the case at bar, where the defendant's position was that he was never involved in the offenses charged.

Nevertheless, this instruction, while inapplicable to the case at bar, allowed the prosecutor to argue that the defendant was accountable for his son's conduct because he suspected his son had done something wrong after July 2, but prior to July 19, and did nothing to report his son or to prevent successful completion of his son's scheme to defraud his insurance company. It is highly probable that this instruction, combined with the improper argument of the prosecutor, led the jury to convict the defendant of the offense of fraud on an insurance company even though the evidence did not support such a verdict under the law.

In sum, the only evidence the prosecution presented in this case upon which the jury could have convicted the defendant of fraud on an insurance company was that the defendant did not report his son or otherwise prevent commission of the offense after he became suspicious of his son's involvement in the offense and, that after the offense was committed, he allowed his son to cash the insurance check he had received. This evidence does not render the defendant guilty of the offense charged, and, accordingly, we reverse the defendant's conviction.

The decision of the circuit court of Whiteside County is reversed.

Reversed.

STOUDER, P.J., and SLATER, J., concur.